ORIGINAL

No. ___________ 04-1731C
Judge:__________

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
DEC - 3 2004
U.S. COURT OF FEDERAL CLAIMS

**ARMOUR OF AMERICA**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

# COMPLAINT

Cynthia Malyszek
Attorney
Malyszek & Malyszek
10100 Santa Monica Blvd
Suite 800
Los Angeles, CA 90067
Ph: 310-772-2266
Fax: 310-772-2265

Attorneys for Plaintiff

Dated: December 01, 2004

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**ARMOUR OF AMERICA**

**Plaintiff,**

**v.** **No. ____________**

**THE UNITED STATES**

**Defendant.**

---

## COMPLAINT

Plaintiff, Armour of America, by its undersigned counsel, for its Complaint against Defendant, alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. This action arises out of the Government's improper termination for default of Contract No. N00019-04-C-3147 for the design, test, and manufacture of a Light Weight Armour Replacement System (LWARS) for the United States Marine Corps CH-46E tandem rotor helicopter.

## PARTIES

2. Plaintiff, Armour of America (hereinafter "AOA"), P.O. Box 1405, Beverly Hills,

CA 90213, is a corporation organized under the laws of the State of California, with its principal place of business in Gardena, California. For over 32 years, Armour of America has developed and manufactured protective armour. Some of AOA's accomplishments over the past 32 years include the C-130 (which was given a NATO stock number) in Australia, Canada, Spain, Sweden, Norway, Brazil; Humvees and trucks in Iraq; designed complete armour for EC135. As a result of the Government's actions, helicopters currently being utilized in Iraq cannot have old armour replaced. While it is not urgent, the new armour weighs less which allows more fuel/load capacity/more flying time/more troops to be carried in the helicopter.

3. Defendant is the United States Naval Air Systems Command (hereinafter "NAVAIR" or "Government"), AIR-2.4.3.3 Building 441, 21983 Bundy Road, Putuxent River, MD 20670-1127. Contracting Officer, Janice E. Woehrer, AIR-2.4.3.3, Naval Air Systems Command, 47123 Buse Road, Bldg. 2272, Unit 353, Patuxent River, MD 20670-1547.

## JURISDICTION

4. AOA and NAVAIR are parties to Contract No. N00019-04-C-3147, in the amount of $6,038,958.00, for the performance of for the design, test, and manufacture of a Light Weight Armour Replacement System (LWARS) for the United States Marine Corps' CH-46E tandem rotor helicopter.

5. On August 26, 2004, NAVAIR issued AOA a notice of termination for default on this contract and in addition is seeking reimbursement for reprocurement costs.

6. On September 10, 2004, pursuant to FAR 52.233-1, AOA requested that NAVAIR reconsider the termination for default, claiming that it was improper because of consistent progress with weight reduction and testing as per the contract schedule.

7. On September 17, 2004, NAVAIR responded and, pursuant to FAR 52.233-1, denied AOA's request to reconsider the termination for default, and further stated that it would not convert the termination for default into a termination for convenience.

8. The Board has jurisdiction over this matter pursuant to the Contact Disputes Act, 41 U.S.C. 601 et.seq., and 48 C.F.R. 1033.270.

## STATEMENT OF THE CASE

9. On October 6, 2003, AOA received an advanced notification for the procurement of light weight armour for the United States Marine Corps' CH-46E helicopter, from Janice Woehrer, NAVAIR's contracting officer on this project.

10. On November 8, 2003, John Nehmens, General Manager of AOA, responded, requesting to be placed on the list to receive the Request for Proposals ("RFP").

11. On December 23, 2003, NAVAIR issued Request for Proposals Number N00019-04-R-0073. The Contract was for the design, test, and manufacture of a Light Weight Armour Replacement System (LWARS) for the United States Marine Corps' CH-46E tandem rotor helicopter. The contractor was to design, test, and manufacture armour to protect the CH-46E aircraft from small arms fire. The ultimate purpose of the contract was to decrease the weight of the armour that was currently being used on the aircraft.

12. The RFP stated that the "LWARS shall be capable of at least a V50 ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30 degree angle of obliquity," and shall achieve a 35% reduction of current steel armour weight.

13. On January 22, 2004, NAVAIR issued Amendments 0001, 0002, and 0003.

14. Section M of the RFP stated, "The technical evaluation factors are: Weight,

Ballistics, Environmental Compatibility, Fit and Function and Technical Capabilities. Weight Reduction is more important than the combined importance of Ballistics, Environmental Compatibility, Fit and Function and Technical Capabilities. Ballistics, Environmental Compatibility, Fit and Function and Technical Capabilities are of equal importance."

15. AOA knew that it could meet the RFP's specifications within the time allotted of the contract delivery schedule. AOA determined to bid on their KSP-60 armour which met weight requirements and listed the rounds at muzzle velocity and not lesser 30 degree angle.

16. In the past, AOA offered alternate proposals that varied from the specifications as set out in a RFP, and the Government will often evaluate the alternate proposal and will award the contract to the best offeror by considering whether the entire proposal, meets the Government's goals and the purpose of the contract, even if the proposal's specifications vary from the RFP.

17. Moreover, AOA noticed that the most important factor, as listed in Section M of the RFP, was weight reduction. AOA's proposal bid ballistics that were different from those in the RFP, and still be awarded the contract because its overall proposal was more practical, less costly, and more weight effective than the specifications as set forth in the RFP. Most importantly, AOA's proposal met the required weight reduction, which was listed as the most important factor to be evaluated.

18. Furthermore, AOA believed that it could perform the specification in accordance with Mil Spec A46099B per the RFP.

19. Therefore, in its Proposal, AOA included a breakdown for what its proposed

ballistic panel would be able to accomplish. The proposed armour system to be supplied as a lightweight substitute for the current metallic armour is AOA's Grade KSP-60. The breakdown is as follows:

"KSP-60 will stop the following rounds:

| | | | |
|---|---|---|---|
| 7.62 x 39 | Russian/Chinese | Hardcore | @ 2400 FPS |
| 7.62 x 54 | Russian/Chinese | Hardcore | @ 2900 FPS |
| 7.62 x 51 | NATO | Ball | @ 2700 FPS |
| 5.56 x 109 | NATO | Ball | @ 3300 FPS |
| 5.56 x .885 | NATO | Hardcore | @ 3200 FPS" |

20. AOA never suggested that the KSP-60 will stop the following round, which is what the RFP requested: 30.06 (which is equivalent to 7.62 x 63, in the scale used above) APM2 @ 2900 FPS at 30 ° obliquity.

21. It was blatant in AOA's Proposal that it did not intend on bidding the specifications exactly as they appeared in the RFP, but on lesser specifications, which if accepted by the Government, would cost far less money. AOA only agreed that the armour that it was proposing would stop the rounds as noted above, and not that the one requested in the RFP.

22. In its proposal, on the same page as this information, AOA stated that "Grade KSP-60 armour has an areal density of 6.2 lbs per square foot" which was clarified in subsequent emails.

23. Arthur Schrieber, the president of AOA, corresponded with and informed Janice Woehrer post contract signing that the more realistic specification was the one that AOA included in its proposal, because it is less costly and offers a greater weight reduction. It was assumed that the contract FPS of 2900 was a typographical error and the industry standard of 2700 was intended. AOA quoted the KSP-60 with the initial bid proposal. NAVAIR asked that AOA resubmit the ballistics quote, so at NAVAIR's request AOA resubmitted the ballistics

proposal and then did so a third time after signing the draft of the contract, where AOA found three majors in the contract that were corrected.

24. On February 5, 2004, AOA submitted its signed proposal to the Government.

25. AOA's proposal submitted on February 5, 2004, was the Government's first indication that AOA's specifications in its proposal were different than those in the Government's RFP. The Government never questioned AOA on why its proposal did not offer that which the Government requested in the RFP. However, this was the Government's point of review when it should have first realized that AOA did not offer to meet the specifications in the RFP and did not intend to. Any proper review of AOA's bid would have made this clear to the Government.

26. On February 11, 2004, NAVAIR issued Amendment 0004, increasing the quantities listed.

27. On February 12, 2004, John Nehmens responded to NAVAIR, with a signed acknowledgment of receipt of Amendment 0004, after AOA's submittal of its proposal. AOA informed the Government that it opted not to revise its proposed price after receiving Amendment 0004.

28. On April 1, 2004, Janice Woehrer, Contract Specialist for NAVAIR, issued a list of nineteen questions to AOA, which opened up discussions. She stated that NAVAIR has determined AOA's proposal to be within the competitive range for award. In accordance with Section M of the RFP, she requested that AOA answer the list of nineteen questions.

29. Included in the nineteen questions were requests for clarification regarding

aspects of AOA's bid that were on the same page that included the ballistic specifications. However, none of the questions pertained to the ballistic specifications, and AOA was never asked if it could meet the specification as requested in the RFP.

30. For example, Question #1 asked about the aerial density, and in AOA's response, it corrected its original answer from 6.1 pounds per square foot to 6.2 pounds per square foot. Question #5 also referred to the same page. Question #3 asked AOA to "Provide an assessment of whether your proposed LWARS will meet the Government's ballistics requirement to include documentation, analysis or examples for how your proposed LWARS material will meet the V50 specification."

31. On April 8, 2004, AOA responded to the nineteen questions with its Volume IIA Technical.

32. In response, in Volume IIA Technical, AOA repeated its ballistic capability from its original proposal, answering the questions and explaining its ballistics capabilities:

"As discussed in the original proposal, Armour of America's KSP-60 will stop the following rounds at velocities shown.

| | | | |
|---|---|---|---|
| 7.62 x 39 | Russian/Chinese | Hardcore | @ 2400 FPS |
| 7.62 x 54R | Russian/Chinese | Hardcore | @ 2800 FPS |
| 7.62 x 51 | NATO | Ball | @ 2700 FPS |
| 5.56 x 109 | NATO | Ball | @ 3300 FPS |
| 5.56 x 885 | NATO | Hardcore | @ 3200 FPS |
| 5.56 x | NATO | AP | @ 3150 FPS" |

33. Again, AOA, did not state in its proposal that the KSP-60 would stop the round and velocity as requested in the RFP. If AOA's armour could stop the round at the velocity in the RFP, its proposal would have included the following in its ballistics capabilities: "30.06 (which is equivalent to 7.62 x 63) ADM2 @ 2900 FPS a@ 30° obliquity."

34. On April 12, 2004, Janice Woehrer informed John Nehmens that her technical

team had AOA's answers for the technical proposal revision.

35. On April 14, 2004, AOA submitted its answers to the nineteen questions issued by NAVAIR on April 1, 2004.

36. The Government wanted more products under the contract, so AOA agreed to decrease the contract price close to $6.03 million, if the Government allowed AOA to shorten the delivery time. This would accelerate the contract from March 2006 to September/October 2005. Although this was agreed to by the parties, this was not in the contract and there was never an amendment or a modification to the contract.

37. On April 30, 2004, the Government issued a letter to AOA informing it that the Government had received and completed its evaluation of AOA's response. The letter further stated that there was no requirement for oral discussions, and that all discussions were formally concluded. AOA was then given an opportunity to submit its final revised proposal by May 6, 2004.

38. The Government therefore accepted AOA's ballistic specification for KSP-60 since AOA had never proposed that its armour would withstand a velocity of 2900 feet per second for the .30 col APM2 @ 2700 FPS @ 30° obliquity..

39. On May 6, 2004, AOA sent a letter to Janice Woehrer, with a revised quotation. However, the letter informed Ms. Woehrer that there were no changes to the Technical Proposal in this revision submittal. The pricing proposal was revised per the attached Revision B Price Volume IV, based on AOA's "ability to complete the entire order and ship complete by 31 October 2005 or sooner. AOA further reserves the option to ship up to 20 sets per month."

40. On May 10, 2004, Ms. Woehrer sent AOA an email, stating that she received its proposal and hopes to announce the award within three weeks.

41. On May 27, 2004, Ms. Woehrer sent a Pre-Award Notification to Mr. Nehmens, informing him that AOA was selected to receive the award, and that the Government planned to award the contract the week of June 7, 2004.

42. On June 10, 2004, the parties signed the contract for $6,038,958.00. Amendment 0004 was the increased quantities in which AOA kept the same price.

43. On July 8, 2004, a post-award telephonic conference was held.

44. Mr. Schreiber noticed a difference when comparing the drawings and the physical parts provided by the Government. For example, the dimensions of the drawings were different from the dimensions of the physical parts. Mr. Schreiber asked which one should take precedence. He was informed that the drawings should take precedence.

45. On July 14, 2004, a Program Design Review ("PDR") was held at AOA's office in Gardena, California. Janice Woehrer did not attend the PDR.

46. A week prior to the PDR meeting, Matt Williams sent a power point brief to Janice Woehrer and Linda Johnston, the program analyst, detailing AOA's work on the contract, including its plans for implementation of the contract. Immediately before the meeting, Lt. Colonel Bauman, the end user–informed AOA that he appreciated working with AOA and that he liked their work product.

47. At this meeting, for the first time, the Government informed AOA that AOA's bid and did not meet the specification of the contract. This is the first time also that AOA realized that there was a problem with the Government's interpretation of AOA's proposed ballistic specification. Even though the Government had not questioned AOA's bid regarding this specification, and they had the brief for seven days prior to the meeting, it was not until this date that anything was mentioned to AOA.

48. At this meeting, Lt. Colonel Bauman asked AOA whether its armour would stop the M2 AP Round. Mr. Schrieber said that it would not. When Mr. Schrieber explained that they were showing NAVAIR what AOA had bid on, it was apparent that nobody from NAVAIR knew that AOA had submitted its capabilities three times prior to award.

49. Lt. Col. Bauman asked if AOA could get down to the weight that NAVAIR wanted. Mr. Schrieber responded that AOA would be ale to by using silicon carbide.

50. NAVAIR's PDR presentation expected the prototype kit delivery to be delivered by November 10, 2004. In the risk forecast chart, the prototypes were permitted to be accelerated, but there were contractual requirement for AOA to do so, allowed for one month slide to the right.

51. The contract states that the delivery date shall be in March 2005. The first two QTA's take place five months and seven months after award. The first set delivery was in January 2005. Through emails exchanged in June 2004. AOA agreed to change these dates to October or November 2004, although there was never an amendment or modification to the contract. There was simply an email after the contract review.

52. However, page 21 of the contract still lists that the delivery date of as five months after contract award, and seven months after contract award.

53. On July 30, 2004, the Government issued a Cure Notice, which it purported to be in accordance with FAR Part 49.607. It stated that "the Government considers your failure to successfully demonstrate that your Light Weight Armour Replacement System (LWARS) product meets the basic requirements of contract N00019-04-C-3147, to be a condition that is endangering performance of the contract. The letter warned that "unless this condition is cured to the Government's satisfaction by 25 August 2004, the Government may terminate for default

under the terms and conditions of the Default (Fixed-Price Supply and Service)(APR 1984) clause 52.249-8."

54. AOA was to "Demonstrate via an independent laboratory or test facility that the LWARS product meets or is less than the maximum weight of 6.79 lbs/sq ft. Provide test results to substantiate your proposed material is capable of at least a V50 ballistic limit of 2900 feet per second against a .30 cal APM2 threat at 30-degree angle of obliquity." Also, AOA was to "Demonstrate that the LWARS product will meet or exceed all other test requirements of the contract, especially Environmental and Vibration requirements. This can be done via actual test data or through preliminary analysis of the proposed material. Finally, AOA was to "Provide the samples which have already been tested to PMA-226 for further analysis. The samples requested are those that demonstrated success and which meet or exceed the weight requirements of the contract."

55. On August 20, 2004, AOA successfully stopped ammunition at a velocity of 2891, and there were no penetrations at 7.52 with V50. This was AOA's best result, and was only a few feet per second less than what the Government initially requested in the RFP.

56. On August 24, 2004, AOA informed the Government that the tooling was ongoing and that they were progressing smoothly on the contract.

57. On August 26, 2004, the Government issued AOA a notice of termination for default. The Government terminated the contract even though it was not yet time for AOA to deliver, and despite the fact that AOA was showing significant progress. In fact, HP White's reports showed that AOA was constantly moving forward.

58. The Government is holding AOA to the delivery date as set forth in its bid,

although the dates as set forth in the contract are later. However, despite forcing AOA to follow this aspect of its bid, which does not appear in the contract, the Government is not considering the ballistics that AOA agreed to in the bid.

59. The contract kept the 2900 feet/second velocity, at 30 degrees, but changed the weight to 41% +/- five pounds.

60. AOA never stopped performing. AOA always intended to complete the contract and continued to conduct ballistic testing and in fact achieved a test panel result of V50 2940 at 7.08 lbs on September 24, 2004.

61. On September 10, 2004, AOA requested that the Government reconsider the termination for default.

62. Moreover, in September 2004, Neil Cummings sent a letter saying that AOA could have met the specifications of the contract, as AOA had just tested V50 at more than 2900 feet per second, with a weight close to 7.08 pounds. Per contract, AOA just needed to get to 6.79 pounds and was very close to achieving the final goal.

63. On September 17, 2004, the Government responded to AOA's request to reconsider the termination for default, stating that it would not convert the termination for default into a termination for convenience.

64. On September 3, 2004, there was a test performed on AOA's armour at HP White. The velocity was more than 2900 feet/second, at V50, with 7.55 Weight. Then there was another test after this one, at the end of September, which kept the V50, but brought down the weight.

65. Once it was determined that AOA was required to meet the contract requirement

(which the government considered correct) it was never suggested that AOA could not meet the specifications set out in the contract (which was different than the proposal), in fact AOA stated to the government that they could perform to this specifications.

**FIRST COUNT**

**BREACH OF CONTRACT**

**(Defective Specifications)**

66. AOA herein incorporates, repeats and realleges each of the preceding paragraphs as if fully set forth herein.

67. Plaintiff, NAVAIR, breached the contract due to their issuance of defective specifications. The defective specifications that were issued on Contract No. N00019-04-C-3147 are in direct conflict with the drawings that were included in the contract. The drawings require Mil-Spec A46099B which is in direct conflict with the description of work in the contract. The description of work/SOW and the drawings are in direct conflict. At the preliminary design review NAVAIR stated that the drawings and mil-specs take priority over the statement of work. This action requests a termination for convenience and damages on the grounds that the government did not give due consideration to defective specifications.

68. AOA, plaintiff, has been damaged by NAVAIR's breach in a yet undetermined amount but approximating 2.2 million dollars and herewith reserves the right to make an all inclusive accounting of all damages.

**SECOND COUNT**

**BREACH OF CONTRACT**

**(Government Abuse of Discretion)**

69. AOA herein incorporates, repeats and realleges each of the preceding paragraphs as if fully set forth herein.

70. NAVAIR improperly terminated AOA and abused its discretion. A termination for default is a drastic measure, one that subjects the contractor to forfeiture. *DeVitio V. United States*, 413 F2.d 1147, 1153 (Ct. Cl. 1969). For this reason, the Government bears the burden of proof as to whether the termination for default is justified. In deciding whether to terminate for default, 48 C.F.R. (Federal Acquisition Regulations (FAR)) part 49.402-3(f) lists seven factors to consider. NAVAIR also has breached the contract in that they have failed to make a decision based upon these merits and did not exercise appropriate discretion in terminating AOA for default.

71. AOA, plaintiff, has been damaged by NAVAIR's breach in a yet undetermined amount but approximating 2.2 million dollars and herewith reserves the right to make an all inclusive accounting of all damages.

**<u>THIRD COUNT</u>**

**ACCEPTANCE OF NONCONFORMING BID**

72. AOA herein incorporates, repeats and realleges each of the preceding paragraphs as if fully set forth herein.

73. NAVAIR accepted AOA's nonconforming proposal, in violation of FAR § 14.301. FAR § 14.301(a). AOA submitted a bid in compliance with the proposal requirements in section M of the RFP that stated that "The technical evaluation factors are: Weight Ballistics, Environmental Compatibility, Fit and Technical Compatibilities. Weight Reduction is more

important than the combined importance of Ballistics, Environmental Compatibility, Fit and Technical Capabilities which are of equal importance." AOA during the proposal had submitted their technical proposal based on a trade-off between ballistics and weight as stated in section M. AOA has never made the statement that their proposal was in full compliance with the statement of work, it was clear and it stated in plaintiff's proposal what ballistics they could meet and the weight that plaintiff was offering. Defendant, NAVAIR, accepted AOA's proposal based on the ballistics that were stated in the proposal.

74. AOA, plaintiff, has been damaged by NAVAIR's breach in a yet undetermined amount but approximating 2.2 million dollars and herewith reserves the right to make an all inclusive accounting of all damages.

## <u>FOURTH COUNT</u>

## NAVAIR'S DEFAULT TERMINATION OF AOA WAS IN ERROR WITHOUT VALID REASON AND SHOULD BE CONVERTED INTO A TERMINATION FOR CONVENIENCE

75. AOA herein incorporates, repeats and realleges each of the preceding paragraphs as if fully set forth herein.

76. NAVAIR must prove that AOA could not perform the entire contract within the time remaining for performance. *Lisbon Contractors, Inc., V. United States*, 828 F2.d 759 (Fed. Cir. 1987). NAVAIR does not have any reports or documentation that states that AOA was going to be late or was endangering performance in any way. Nor has the Government completed any on-site inspections of AOA's performance. AOA has made no inconsistent statements as to when delivery would be made, in fact, AOA has always stated that delivery would be made in

accordance with the contract delivery schedule. If there had been any deficiencies in contract performance they were all "readily remediable" before the delivery date. AOA has met all milestones and have test reports showing the continued progress that was being made. NAVAIR cannot show any proof that performance was endangered, and further AOA has given NAVAIR numerous assurances that they were going to meet the contract delivery dates. Commercial impracticality of performance under the contract excuses default. The requirements that NAVAIR stated in their contract statement of work are considered to be a state of the art amour that cannot be met given the contract value and the short time required for delivery. AOA is excused from performance because the contract as written is not intended by either party to produce an item that is pushing the State of the Art.

77. AOA, plaintiff, has been damaged by NAVAIR's breach in a yet undetermined amount but approximating 2.2 million dollars.

## PRAYER FOR RELIEF

Wherefore, Plaintiff by its counsel, respectfully requests that this Court:

**a)** Grant judgment in plaintiff's favor declaring that Defendant has improperly terminated the contract for default,

**b)** Grant judgment in plaintiff's favor finding that defendant breached the contract against plaintiff,

**c)** Grant breach of contract damages to plaintiff in the amount of approximately 2.2 million dollars,

**d)** Or in the alternative, convert the termination for default of the aforesaid Contract into a termination for convenience under FAR § 52.249-2 with costs to be determined,

e) Award damages pursuant to FAR § 5 U.S.C § 5542(a),

f) Award Plaintiff reasonable attorney's fees, costs and expenses; and

g) Award such other equitable and legal relief as the Court deems just.

Dated: December 01, 2004

Respectfully Submitted,

Cynthia Malyszek
Malyszek & Malyszek
10100 Santa Monica Blvd
Suite 800
Los Angeles, CA 90067
Ph: 310-772-2266
Fax: 310-772-2265

Attorneys for Plaintiff
Armour of America

## CERTIFICATE OF SERVICE

I, Cynthia Malyszek, hereby certify that I have placed a copy of Armour of America's Complaint in a Federal Express Overnight Depository to:

Janice E. Woehrer
AIR-2.4.3.3
Naval Air Systems Command
47123 Buse Road, Bldg. 2272, Unit 353
Patuxent River, MD 20670-1547
301-757-6551

Office of the Clerk
U.S. Court of Federal Claims
Room #103
717 Madison Avenue W.
Washington, D.C. 20005
202-219-9657

on this date of December 01, 2004