IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARMOUR OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1731C |
| v. | ) | (Chief Judge Edward J. Damich) |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

REVISED JOINT PRELIMINARY STATUS REPORT

Pursuant to this Court's August 18, 2005 order granting defendant's unopposed motion for a stay. and Rule 16 and Appendix A, paragraph III, 4, of the Rules of this Court ("RCFC"), and the Special Procedures as revised on August 23, 2004, the parties file the following supplemental joint preliminary status report:

(a) Jurisdictional Basis Upon Which Plaintiff Relies

Plaintiff's action arises pursuant to an express contract between Armour of America ("AOA") and the United States, through the Department of the Navy. The action is brought on an appeal from a final decision of the contracting officer that terminated AOA's contract for default. AOA states that this Court possesses jurisdiction to entertain this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609. AOA seeks the Court's determination on whether the default termination was improper and thus convertible to a convenience termination, and a finding on whether there was a breach resulting from either bad faith or the contracting officer's abuse of discretion in issuing the termination for default. To the extent AOA seeks the conversion of the termination for default to a termination for convenience, defendant does not currently dispute the Court's jurisdiction. The Court, however, does not have jurisdiction to

award plaintiff termination for convenience damages in the absence of a contracting officer's final decision addressing that issue. In the event that the Court converts the termination for default into a termination a convenience, AOA states that AOA will submit a termination for convenience claim to the contracting agency. In addition, AOA's complaint contains four counts, each of which seeks the same $2.2M in damages based upon the Government's alleged various breaches of the contract. On September 17, 2005, the Government filed a motion to dismiss for lack of subject matter jurisdiction those counts upon the ground that none of the claims contained in those counts were submitted as claims under the Contracts Disputes Act to the contracting officer for final decision. In addition, if the Government's motion to dismiss is denied, the Government may file a motion for partial summary judgment challenging the allegations in the complaint alleging that the Government is bound by the non-conforming bid submitted by AOA and the count alleging that the specifications were impossible to meet.

(b) Consolidation

The parties do not believe that this case should not be consolidated with any other case.

(c) Bifurcation

The parties are not aware of any reason why liability and damages should be tried separately.

(d) Deferral

The parties do not believe that further proceedings in this action should be delayed pending consideration of another case by this Court.

(e) Remand/Suspension

The parties do not intend to request remand or suspension.

(f) Joinder

The parties do not believe that additional parties should be joined.

(g) Dispositive Motions

Defendant has filed a motion to dismiss for lack of subject matter jurisdiction count I through IV of the complaint upon the ground that none of the claims contained in those counts were submitted as claims under the Contracts Disputes Act to the contracting officer for final decision. In addition, the Government may file a motion for partial summary judgment challenging allegations in count III (acceptance of a non-conforming bid) and count IV (specification impossibility).

(h) Relevant Issues

Plaintiff's Statement Regarding The Relevant Issues

AOA's Factual Issues

1.) Whether the Government issued the solicitation/contract with defective specifications with the drawings requiring Mil-Spec A46099B which is in direct conflict with the description of work in the contract.

2.) Whether the Government abused its discretion in issuing the termination for default and breached the contract.

3.) Whether the Government accepted a non-conforming bid proposal.

4.) Whether the Government abused its discretion and breached the contract in not allowing the proper time provided by the contract to complete performance.

5) Whether the Government's default termination was improper, in error, an abuse of discretion, or breach and should be converted into a termination for convenience.

AOA's Legal Issues

1.) Whether the Government was bound to its acceptance of AOA's bid proposal, and not the solicitation's specifications and description of work upon which it awarded the contract.

2.) Whether the Government could accept AOA's bid proposal which differed from the solicitation despite the Government's explicit knowledge of the non-conforming proposal.

3.) Whether the Government wrongfully terminated the contract for default, after AOA agreed to perform to the Government's original (not the accepted bid proposal) contract/solicitation specifications and delivery schedule.

4.) Whether the improper termination for default determination should entitle AOA to a termination for convenience.

5.) Whether the improper termination for default determination should entitle AOA to damages for contract breach.

6.) Whether the Government purposefully misled AOA into believing that their proposal as submitted was to be accepted for contract performance

7.) Whether AOA's performance on the contract was significant and in line with the Government's required performance and delivery schedule of the contract.

8.) Whether the Government terminated the contract for default based on an incorrect delivery date, which was 5 months prior to the actual contract delivery date.

9.) Whether the Government did accept a conforming bid, thus making the contract invalid, thus with no meeting of the minds on a material element of the contract, and thus without a valid default.

Plaintiff's Statement of Facts

On February 5, 2004, plaintiff, AOA, submitted a proposal in response to NAVAIR Solicitation N00019-04-R-0073 for the LWARS Armor Replacement System. In this proposal response, AOA clearly identified that they were offering their own Grade KSP-60 armour to meet the requirement. A copy of the Grade KSP-60 Test Report was furnished to the Government with the quotation from plaintiff.

Beginning on March 1, 2004, AOA started receiving questions concerning the proposal, but not regarding the ballistics. On April 1, 2004, the contracting officer sent a letter to AOA stating that "following a thorough review and evaluation of your proposal to Section M of the solicitation and FAR 15.306, the Government has determined your proposal to be one of those within the competitive range for award". This letter included an attachment with 19 questions. Eight of the questions related to the ballistic proposal portion of the LWARS proposal. No questions were asked about whether the armour proposed would stop the round per the solicitation. The plaintiff sent responses to the 19 questions on April 8, 2004. The response was submitted as Technical Volume IIA.

The Government sent notice on April 30, 2004 that they had completed their evaluation of the answers to their questions, and stated that there was no need to have oral questions or discussions. However, in this letter the Government asked for a price reduction due to their budget of $5,000,000. On May 6, 2004, plaintiff sent a response by lowering the price, and stated that there was no change in their technical proposal.

On May 10 & 11, 2004, plaintiff received further questions relating to line item pricing only, but not on technical issues. And on May 27, 2004, plaintiff received the pre-award letter.

On June 7, 2004, plaintiff received the contract for review from Government.

Warranty information was requested on June 3, 2004 from the Government, and the plaintiff responded with Grade KSP-60 warranty information to the Government. On three different occasions the plaintiff sent the ballistics to the Government who then reviewed them, asked questions, and accepted plaintiff's proposal. Such acceptance was stated by the government in its April 30, 2004 letter, with the contract being issued on 7 June 2004.

On July 7, 2004, AOA sent a copy of the PDR presentation to the Government for review prior to the 14 July 2004 PDR Meeting at plaintiff's facilities. The Grade KSP-60 ballistic capability chart was included. The meeting was held and the Government determined for the first time that plaintiff's proposed armour system would not stop a 7.62 API M2 round. The plaintiff stated that there was no intention to stop the required round in the proposal nor was there any statement that the Grade KSP-60 could stop round. The plaintiff stated that a new panel would be developed to stop the round and it would take thirty days to develop the required armour panel with both the ballistics and weight per requirement. The plaintiff started manufacturing panels using silicon carbide tile.

On August 24, 2004, the plaintiff traveled to meet with NAVAIR to show the current status. AOA showed the H.P. White test report that a panel weighed 7.5 lbs with a V50 of 2905. Further, AOA presented documentation that the required tooling was completed and that the special fastener required to allow interchangeability of the armour between aircraft was designed. The Government asked how long it would take to bring the armour panel into the required weight of 6.78 lbs/sq ft, and the plaintiff responded up to three weeks based on material and test time on the range.

The contract was terminated approximately 45 days after award with 105 days left to deliver a qualifying kit proof (due November 10, 2004 five month after award). On August 24, 2004, (45 days into the program), AOA presented the following status to NAVAIR: hat the ballistic panel weighs 7.5 lbs ( .7 lbs over requirement) and 2905 fps (at requirement), that the contoured production tooling and mounting hole tooling were completed and ready for kit proof panel manufacturing, and specially designed floating fastener was designed and ready for prototype production. This was required to allow for interchangeability between aircraft. No Government representative ever visited plaintiff's facility to conduct a status of the program survey.

The plaintiff never contended that there was no requirement to meet the ballistic specification, instead it contended from the time that the proposal was submitted that Section M, of the RFP, stated that weight reduction was more important than the combined importance of ballistic, environmental, fit and technical capabilities. The proposed solution by plaintiff offered a weight savings that was greater than the RFQ requirement. Per the RFQ, the ballistic capability was not as important therefore armour was offered that gave a huge weight reduction with a lesser ballistic capability.

There was no requirement to include a certificate listing exceptions, deviations, and waivers that the offeror took to the provisions of the RFP. The plaintiff provided in the technical proposal, all information necessary to conduct a technical evaluation. The letter from the NAVAIR company, dated April 1, 2004, states, "following a thorough review and evaluation of your proposal in accordance with Section M of the Solicitation and FAR 15.306, the Government has determined your proposal to be one of those within the competitive range of award." Included

in this letter are a list of technical and price questions that were needed to finalize the selection. The plaintiff was not asked to explain their proposed ballistics. The plaintiff answered in its technical volume of April 1, 2004, all questions presented by the Government concerning its proposal, and thus described the weight savings the proposed LWARS would provide, as well as discussing the type of material, reasons for choice of material, the strengths and weaknesses of the chosen material, and weight savings in pounds, as well as a description of the qualification test procedures by which the offeror would meet the ballistics requirement of the RFP.

The main factor that caused AOA to submit a quotation, was the Government solicitation statement "Weight reduction, however, was more important than the combined importance of ballistics, environmental compatibility, fit and technical capabilities." The KSP-60 material proposed was significantly lighter than the armour required to stop the ballistic round called out and weight being the driving factor in the re-armour effort, AOA decided to offer the KSP-60 and see if it generated any interest.

The plaintiff's proposal clearly called out that it "...would stop the following rounds at the velocities shown", additionally, the KSP-60 HP White Test Report was sent to Julie Matheny and Janice Woehrer on April 8, 2004 as an attachment along with a picture of the panel.

The Government has stated that the plaintiff's ballistics subfactor rating was changed from "unsatisfactory" with "high Risk" to "satisfactory" with "high risk," in part because AOA while AOA state that they would meet all the ballistics requirements of the RFP. AOA never stated once to NAVAIR that they would meet all of the ballistic requirements prior to the award of the contract, and the Government ballistics evaluation team was aware of this through both the proposal and the answers to its 19 questions.

The Government has alleged that during the PDR, the plaintiff notified NAVAIR that it was not certain whether their KSP-60 armour material could meet the weight and ballistics requirements of the contract. The aerial density was exactly as proposed from the KSP-60.

The Government cannot argue that the contract had an accelerated schedule that was not contained within its contents. The Government has been irresponsible and breached the contract buy defaulting based on a stated shorten delivery time of the LWARS product from March 2006 to September/October 2005. The contract does not contain an accelerated schedule.

Defendant's Statement Regarding The Relevant Issues

Government's Statement of Facts

The CH-46E helicopter is used to transport Marines. The CH-46E is fitted with metallic armor plates to protect the engines and the flight control closet from small arms fire. The total weight of the metallic armor system is 497 pounds.

On December 24, 2003, a request for proposal ("RFI") was issued for a Light Weight Armor Replacement System ("LWARS") to replace the existing CH-46E metallic armor system with a lightweight substitute that will result in a 35% or more weight reduction. The solicitation contained clear specifications for both weight and ballistics requirements. Specifically, the solicitation required the offerors to design a LWARS product that would provide, in pertinent part, at least a 35% reduction in weight with a V50 ballistic limit of 2900 feet per second against a .30 caliber armor piercing missile ("APM") threat at a 30-degree angle of obliquity.

The offeror was required to include in its offer all exceptions, deviations, and waivers that the offeror took to the provisions of the RFP and include a certificate by the offeror that no other exceptions, deviations, and waivers to any provision or the RFP were included elsewhere in the

proposal.[1] In addition, the offeror was required to provide all information and data necessary to conduct a thorough and complete technical evaluation. The offeror's proposal had to describe the weight savings in pounds the proposed LWARS would provide and discuss the type of material, reasons for choice of material, the strengths and weaknesses of the chosen material, as well as a description of the qualification test procedures by which the offeror would meet the ballistics requirement of the RFP.

The evaluation factors were technical, past performance, and price, each being of equal importance. Combined, technical and past performance are significantly more important than price. The technical evaluation subfactors factors were: weight, ballistics, environmental compatibility, fit and technical capabilities. Weight reduction, however, was more important than the combined importance of ballistics, environmental compatibility, fit and technical capabilities.

In its February 9, 2004, proposal, AOA did not raise any deviation, waivers or exceptions to the RFP. AOA proposed an armor material that offered a weight savings of 41 percent. AOA identified the specific threats that its proposed armor could meet. AOA did not specifically state that it could meet the RFP's ballistic requirements.

During the technical evaluation of the weight subfactor, AOA received an overall technical rating of "outstanding" with "medium" risk. However, for the ballistics subfactor

---

[1] An exception is where an offeror states it will not comply with a requirement, usually involving a contract term or condition. A deviation is where an offeror states it will not comply with a requirement but proposes an alternative to meet the intent of the requirement, usually involving a specification. Exceptions, and deviations may cause proposals to be considered unacceptable. In fact, the RFP warned offerors that taking exception to any term or condition in the RFP would make an offer unacceptable, and the offeror ineligible for award, unless the RFP expressly authorized such an exception with regard to that specific term or condition.

technical rating, AOA received an overall technical rating of "unsatisfactory" with "high" risk because failed to demonstrate its ability to meet the ballistic requirements.

On April 1, 2004, NAVAIR opened discussions with AOA. On or about April 12, 2004, AOA, in responding to NAVAIR's concerns, again identified the ballistic capabilities of its proposed armor. While stating that its proposed armour would be tested to the V50 ballistics limits, AOA did not specifically state that it could meet all of the RFP's ballistic requirements.

In its May 6, 2004, final revised proposal, AOA made no changes to its technical proposal. Again, AOA did not raise any deviation, waivers or exceptions to the RFP.

On May 21, 2004, AOA's ballistics subfactor rating was changed from "unsatisfactory" with "high risk" to "satisfactory" with "high risk." The evaluation team believed that AOA could meet the RFP ballistic requirements based upon the information contained in AOA's proposal.

AOA's proposal was selected from among the nine proposals considered because it was determined to represent the best value to the Government.

On June 10, 2004, AOA was awarded the contract with a contract value of $4,067,434 for a Light Weight Armor Replacement System ("LWARS") for the CH-46E helicopter.

The LWARS contract included a five-month design, development and testing phase.

At the Program Design Review ("PDR") on July 14, 2004, AOA notified NAVAIR, for the first time, that it was not certain whether its proposed armor could meet the weight and ballistics requirements of the contract. Specifically, AOA stated the its proposed armor could not stop the APM2 round.

On July 15, 2004, AOA again expressed to NAVAIR doubts as to AOA could meet both the weight and ballistic specifications.

On July 19, 2004, AOA informed NAVAIR that testing did not go as well as expected and that AOA was not able to meet both the weight and ballistic specifications with its proposed material.

On or about July 27, 2004, AOA decided to use a different material. Upon testing, it was determined that the new material failed to meet the minimum weight and ballistics requirements.

On July 30, 2004, the contracting officer ("CO") issued to a cure notice to AOA for failure to make progress so as to endanger performance pursuant to the default clause; AOA was given August 25, 2004, to cure its failure by demonstrating, among other things, that AOA's LWARS material met the weight and ballistic requirements of the contract.

In an August 4, 2004 letter, AOA questioned the ballistic requirement and contended that the ballistics requirement was impossible to achieve.

On August 24, 2004, AOA advised NAVAIR that AOA that was unable to meet the weight and ballistic requirements of the contract, but believed they could do so if given an indeterminate amount of time.

On August 26, 2004, the CO, after concluding that AOA was unable to meet the weight and ballistic requirements in the contract and that AOA's participation in the LWARS program was not essential to successful performance under this program, terminated the LWARS contract for default for failure to make progress which had endangered performance under the contract.

On November 5, 2004, the CO issued contract to ArmorWorks in the amount of $6,121,242 for the reprocurement of LWARS for the CH-46E helicopter.

Government's Factual Issues:

1.) Whether AOA failed to make progress in the performance of the contract.

2.) Whether AOA's proposed armor material could have met the weight and ballistics requirements of the contract.

3.) Whether the contract specifications, alone or in combination, were impossible or commercially impracticable to achieve.

Government's Legal Issues

1.) Whether AOA was bound by the ballistic specifications in the contract that differed from the proposed ballistic specification that AOA included its proposal.

2.) Whether the ballistics specifications were defective.

3.) Whether AOA was failing to make progress so as to endanger performance under the contract.

4.) If in default, whether AOA can prove by the preponderance of the evidence that its default should be excused.

5.) In the event that the termination for default is not sustained, whether AOA is entitled to recover money damages.

6.) Whether the Government can prove by the preponderance of the evidence that it is entitled to recover its re-procurement costs.

(i) Advisability of ADR

The parties are currently conducting settlement negotiations. Defendant’s July 13, 2005 unopposed motion fora 30-day stay pf proceedings was granted. A second unopposed motion for a 60-day stay was granting thereby extending the stay until October 21, 2005.

(j) Joint Proposed Schedule

i. Exchange of documents: December 1, 2005.

ii. Completion of fact witness discovery by March 1, 2006

iii. Designation of expert witnesses by January 15, 2006, and exchange of expert witness reports by April 15, 2006.

iv. Completion of expert witness discovery by May 15, 2006

v. The presumptive discovery limit shall apply in this case.

vi. The physical examination of the subject materials are not believed to be necessary in this case.

vii. The parties are available for a status conference with the Court on the following dates, following the close of discovery:

a. May 23, 2006

b. May 24, 2006

c. May 25, 2006

viii. The earliest date by which this case could reasonably be expected to be ready for trial is August 30, 2006.

ix. The preliminary status conference was scheduled for June 20, 2005. This conference was cancelled due to the unavailability of counsel for plaintiff. It was re-scheduled for July 22, 2005. That conference was cancelled because the defendant's unopposed motion for a stay was granted on July 14, 2005.

(k). Joint Representation Concerning Early Meeting of Counsel.

Counsel represent that they have held an early meeting of counsel, conducted

telephonically, on April 27, 2005.

(l). Estimated Litigation Costs

Plaintiff's estimate of the litigation costs:

1.) Through the end of discovery: $200,000

2.) By the end of trial: $285,000

3.) Through appeal, if any: $300,000

Defendant's estimate of the litigation costs:

1.) Through the end of discovery: $100,000

2.) By the end of trial: $150,000

3.) Through appeal, if any: $155,000

(m) Trial

If this case does not settle, the parties will proceed to trial that is expected to last from five to eight days. The parties agree that an expedited trial pursuant to paragraph 6(b) of Appendix G is not warranted.

(n) Electronic Filing

The parties are not aware of any special issues regarding electronic case management needs.

(o) Additional Information

Plaintiff requests that the trial be held in Los Angeles, California; defendant requests that the trial be held in Washington, D.C. The parties are unaware of any other matters which should be brought to the Court's attention at this time.

(p) Response to Questions by Order dated June 20, 2005:

Question a. Defendant:

You allege that the Court may lack jurisdiction of Plaintiff's damages claim because Plaintiff has not submitted a 'termination for convenience settlement proposal." However, you have also agreed with Plaintiff that dispositive motions are "unlikely" to be filed. Why would you refrain from filing a motion to dismiss if you believe that jurisdiction is lacking?

Defendant’s response to question a:.

In its complaint, plaintiff seeks the conversion of the termination for default to a termination for default. The Government did not, and does not currently, question the Court’s jurisdiction to address the merits of plaintiff’s assertion that this Court has jurisdiction to entertain the merits of plaintiff’s contention that the termination for default was unwarranted. However. if the Court were to rule on that issue in favor of plaintiff, the Court would not have jurisdiction to award plaintiff damages. Instead, plaintiff would then have to submit a proposal to the contracting officer documenting its termination for convenience costs. Plaintiff in its complaint, however, seeks approximately $2.2M in damages, apparently allegedly resulting from the termination for default. On September 19, 2005, defendant filed a motion to dismiss those counts of the complaint that allege that the Government breached the contract upon the ground that plaintiff failed to submit a certified claim with the contracting officer regarding those allegations.

Question b. Both: Provide the ballistic specification that was included in the actual contract (not just the Request for Proposal (RFP)).

Defendant’s response to question b:

The pertinent sections of the contract, including those sections containing the ballistic

specifications, is contained in the Appendix as exhibit 1.

Plaintiff's response to question b:

The ballistic specifications for the CH-46 LWARS contract are outlined on pages 8 of 86, paragraph 4.1 of Contract No. 0019-04-C-3147 dated June 10, 2004. Appendix, Exhibit 1. Additionally, this is stated in Section (A) on contract amendment dated January 22, 2004, page 2 of 3, Section C, No. 4. The ballistic specification is delineated in Section C of the contract entitled, "Description/Specs/Work Statement." The Statement of Work in Section C and specifically defined in Sections 3 - 8. Section "3: Applicable Documents" lists "MIL-STD-662F for V50 Ballistic Test for Armor." Appendix, Exhibit.

Section "4.1 LWARS Requirements (CLIN 0001)" begins "(t)he contractor shall design a LWARS to be a fit and function lightweight replacement for the existing metallic armor system. The existing armor design, installation, marking/identification, and finish requirements are defined by drawing numbers listed in paragraph 4.1.1 below."

Section 4.1 continues with the weight requirement as follows, "(t)he LWARS shall provide, at a minimum, a 41% +/- 5 lbs. reduction in areal density over the existing metallic armor system, and no recurring routine maintenance after installation."

Then following this weight requirement in section 4.1, it states the ballistic requirement, "(t)he LWARS shall be capable of at least a V50 ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at 30-degree angle of obliquity" and the "LWARS shall be able to withstand multiple ballistic impacts of 3 equidistant hits in a 3-inch circle, which is 2.6 inches between shots, and be made of material that readily accepts the surface finish requirements of the aircraft."

Section "4.1.1 LWARS Kit" lists Group A Kit drawing (91145) 70894-1 External as the ballistics drawing requirement. Appendix, Exhibit. Section "4.1.2 LWARS Drawings: states, "Product drawings shall provide the design disclosure information necessary to maintain quality control of the resulting physical and functional capabilities." Section "4.2.1 Qualification Test Procedures" lists the 4.2.1.1 "Weight" factor first, and then the "Ballistics" factor second in 4.2.1.2.

AOA never stated that they could not perform to the government's contract specifications within the stated contract delivery period. The proposal was submitted with stated ballistics that did not meet the government's solicitation requirements, however, the government awarded the contract to AOA with full knowledge that the proposal never stated that it would meet the solicitation's ballistic specifications. The proposal was accepted after the government's ballistic team's evaluation. AOA was under the assumption that they were building the armour to their proposal when the contract was awarded and signed (at the request of the government) on the same day.

Question c. Both:

Explain the differences in opinion regarding the date on which performance was due. Was an accelerated schedule ever provided for in the contract or in an amendment?

Defendant's response to question c:

The Government does not contend that plaintiff had to complete its non-recurring engineering activities ("NRE") or deliver the qualification test articles ("QTA") prior to November 10, 2005.

The contract contains base contract line item numbers ("CLINS") for the non-recurring

engineering and for the qualification test articles, and options for ordering the LWARS Production kit. The following are the pertinent CLINs:

CLIN 0001 FFP: Non-Recurring Engineering

CLIN 0002 FFP: Qualification Test Article

The delivery schedule that is set out in Section F of the Contract provides, in pertinent part, as follows:

CLIN 0001: Non Recurring Engineering: no later than five months after contract award

CLIN 0002: Qualification Test Systems: no later than five months after contract award

Thus, pursuant to Section F of the contract, for the NRE, CLINs 0001 served as a five-month design, development and testing ("DD&T") phase pursuant to which plaintiff and the Government were to engage in design and development activities in order to develop an armor product for the CH-46E. In addition, for the QTA, CLIN 0002 required that it also be delivered no later than five months after contract award. Since the contract was awarded on June 10, 2004, plaintiff was to complete DD&T and deliver the QTA no later than November 10, 2004.

<u>Plaintiff response to question c:</u>

No accelerated schedule was ever provided for in a solicitation amendment, nor in the contract dated June 4, 2004, nor in a subsequent modification. Under Section C, page 15, section "8.3 Hardware Delivery" of the contract, it requires that the "contractor shall deliver LWARS kits in the quantities specified in Sections B and F of the contract, or as otherwise ordered by the Government."

<u>Plaintiff' s response to question c:</u>

No accelerated schedule was ever provided for in a solicitation amendment, nor in the

contract dated June 4, 2004, nor in a subsequent modification. Under Section C, page 15, section "8.3 Hardware Delivery" of the contract, it requires that the "contractor shall deliver LWARS kits in the quantities specified in Sections B and F of the contract, or as otherwise ordered by the Government."

Section "F-2 Time of Delivery" charts the delivery schedule required by contract.

| DELIVERY BY SCHEDULE | | |
|---|---|---|
| ITEM NO. | QUANTITY | DELIVERY DATE |
| NRE | See Section B - CLIN 0001 | NLT 5 MOS After Contract Award |
| 2 Qualification Test Systems | See Section B - CLIN 002 | NLT 5 MOS After Contract Award |
| Data for Items 0001 and 0002 | See Exhibit A - (CDRLs) | See Exhibit A - (CDRLs) |
| Option L WARS Production Units | See Section B - CLINs 0005 and 0006 | Option exercised NLT 7 MOS After Contract Award - See Below |
| Option L WARS Interim Support Spares | See Section B - CLIN 0007 | Option Exercised NLT 7n MOS After Contract Award - See Below |
| Option L WARS Maintenance Trainer Kits | See Section B - CLIN 0008 | Option exercised NLT 7 MOS After Contract Award - See Below |
| Field Support Services | See Section B - CLIN 0009 | Option exercised NLT 7 MOS After Contract Award and shall continue through delivery of the final production unit. |

Immediately following this chart is:

> "Note 1 : Armour of America has offered an accelerated schedule per letter dated May 6, 2004. AOA will complete the entire LWARS order and ship complete by 31 October 2005 or sooner. AOA further reserves the option to ship up to 20 sets per month. The Government would like to accept this accelerated schedule. The details of the accelerated schedule *will be incorporated into the contract via a*

*future modification."* (emphasis added). Plaintiff notes that no future modification was ever formulated nor added to the contract.

"Note 2: Per the Government's requirements, delivery of the LWARS production units shall begin no later than 5 months after exercise of the option. A minimum quantity of 12 each production LWARS per month shall be delivered F.O.B. Origin. For example, with the exception of the first delivery, ifCLINs 0005/0006/0007/0008 are exercised on 1 Oct 04, the delivery schedule shall be as follows:

| CLIN | YR | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT |
|---|---|---|---|---|---|---|---|---|---|---|
| 0005/ 0006 | 05 | | | | | | 3 | 12 | 12 | 12 |
| | | OCT | NOV | DEC | | | | | | |
| 0005/ 0006 | 05 | 12 | 12 | 12 | | | | | | |
| CLIN | YR | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT |
| 0005/ 0006 | 06 | 12 | 12 | 12 | 12 | 12 | 12 | | | |
| CLIN | YR | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT |
| 0007 | 05 | | | | | | 3 | 3 | | |
| CLIN | YR | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT |
| 0008 | 05 | | | | | 2 | | | | |

Prior to the PDR, in correspondence with Julie Matheny, dated 9 June 2004, AOA identified that the accelerated schedule was not part of the contract. However, in NAVAIR's PDR presentation, they expected the prototype kit delivery to be delivered by November 10, 2004. The contract states on page 21, that the delivery schedule of the QTA is 5 months al~er

award and production units 7 months after award.

Question d. Defendant:

On page 10 of the JPSR, you allege that the value of the contract at issue was around $4 million, but at paragraph 42 of your answer, you admit plaintiff's allegation that the contract value was around $6 million. Please explain this discrepancy.

Defendant's response to question d.

The statement on page 10 of the JPSR was made in error. The contract awarded to plaintiff on June 10, 2004, had a potential contract value of $6,038,958.00. This amount included the base contract, as well as all options for the production units. CLINs 0001-0004 comprise the base contract. CLIN 0001 is valued at $0; CLIN 0002 is valued at $69,814; CLIN 0003 is valued at $0; CLIN 0004 is a cost reimbursable effort not to exceed $50,000. No options had been exercised on the contract prior to the termination. Therefore, at the time of termination, the value of the base contract was, at most, $119,814.

Question e: Plaintiff:

Please explain paragraph 73 of your complaint. Does this paragraph argue that your bid on the RFP was conforming or nonconforming?

Plaintiff's response to question e:

Plaintiff's complaint paragraph 73, stated, "NAVAIR accepted AOA's nonconforming proposal, in violation of FAR § 14.301. FAR § 14.301(a). AOA submitted a bid in compliance with the proposal requirements in section M of the RFP that stated that "The technical evaluation factors are: Weight Ballistics, Environmental Compatibility, Fit and Technical Compatibilities. Weight Reduction is more important than the combined importance of Ballistics, Environmental

Compatibility, Fit and Technical Capabilities which are of equal importance. AOA during the proposal had submitted their technical proposal based on a trade-off between ballistics and weight as stated in section M. AOA never made the statement that their proposal was in full compliance with the statement of work, it was clear and it stated in plaintiff's proposal what ballistics they could meet and the weight that plaintiff was offering. Defendant, NAVAIR, accepted AOA's proposal based on the ballistics that were stated in the proposal."

AOA submitted their proposal based on the importance of the weight requirement being "more important than the combined importance of ballistics, …" AOA knew their proposal was not in total alignment with both the weight and ballistics, but took the above quoted statement as the "most important" requirement and submitted their proposal. Content from both the top and the bottom of the same page (page 2) of AOA's Technical Volume II proposal that included the ballistic information AOA proposed was questioned by NAVAIR in its April 1, 2004 letter containing nineteen questions . While eight of those questions related to the ballistic proposal portion of the LWARS proposal, no questions were asked about whether the armour proposed would stop the ballistic round in question. AOA answered the questions in their submittal of Technical Volume IIA.

AOA's proposal was based in accordance with section M evaluation factors of the solicitation and could be termed non-conforming or an alternative proposal because AOA based its proposal on the priority of the evaluation factors. In its' proposal, AOA included a breakdown for what its' proposed ballistic panel would be able to accomplish. The proposed armor system to be supplied as a lightweight substitute for the current metallic armor is AOA's Grade KSP-60. The breakdown is as follows:

"KSP-60 will stop the following rounds:

| | | | |
|---|---|---|---|
| 7.62 x 39 | Russian/Chinese | Hardcore | @ 2400 FPS |
| 7.62 x 54 | Russian/Chinese | Hardcore | @ 2900 FPS |
| 7.62 x 51 | NATO | Ball | @ 2700 FPS |
| 5.56 x 109 | NATO | Ball | @ 3300 FPS |
| 5.56 x .885 | NATO | Hardcore | @ 3200 FPS" |

AOA never suggested that the KSP-60 will stop the following round, which is what the RFP requested: 30.06 (which is equivalent to 7.62 x 63, in the scale used above) APM2 @ 2900 FPS at 30 º obliquity. In the non-conforming proposal, AOA did not intend on bidding the specifications exactly as they appeared in the RFP, but on differing specifications which would cost less with greater weight reduction. AOA only agreed that the armor that it was proposing would stop the rounds as noted in the chart above, and not that the one requested in the RFP. In its proposal, AOA stated that "Grade KSP-60 armour has an areal density of 6.2 lbs per square foot." On April 1, 2004, Janice Woehrer, Contract Specialist for NAVAIR, issued a list of nineteen questions to AOA, which opened up discussions. She stated that NAVAIR has determined AOA's proposal to be within the competitive range for award. In accordance with Section M of the RFP, she requested that AOA answer the list of nineteen questions. Included in the nineteen questions were requests for clarification regarding aspects of AOA's bid that were on the same page that included the ballistic specifications.

On April 8, 2004, AOA responded to the nineteen questions with its Volume IIA Technical. In response, in Volume IIA Technical, AOA repeated its ballistic capability from its original proposal, answering the questions and explaining its ballistics capabilities.

So, while AOA submitted its proposal based on the priority of the weight requirement in the Section M evaluation factors (weight being more important than 2900 FPS), the Government's ballistics evaluation team accepted this bid and accepted the $3 million dollar reduction, yet granted the contract to AOA with the 2900FPS specifications listed in the solicitation and not proposed in the bid. However, AOA agreed to perform to the contract specifications (and not their proposal) and did perform to contract terms in a timely manner based on the contract schedule.

Question f. Plaintiff:

Explain the basis for your allegation in paragraph 44 of the complaint that Defendant made inconsistent specifications.

Plaintiff's response to question f:

Complaint, paragraph 44, states, "Mr. Schreiber noticed a difference when comparing the drawings and the physical parts provided by the Government. For example, the dimensions of the drawings were different from the dimensions of the physical parts. Mr. Schreiber asked which one should take precedence. He was informed that the drawings should take precedence."

As stated in the answer to question (b) above, the drawing and specifications were not in conformity. The specifications were material to the contract, yet the MIL-SPECs were in conflict with drawings.

The "Metal Thickness Chart" included in the contract shows the velocity of a .30 caliber AP round (which is the same thickness of the metal armor that was on the CH-46 helicopter) at 2750 FPS. The blue prints and drawings call-out for 250 thickness and the MIL Spec MIL-A-46099C called 00 on the B/Ps show clearly that if the thickness was .250 then the velocity is 2631

FPS not 2900. At the PDR meeting, AOA was told by te Government not t use the Mil Spec MIL-A-46099C because it does not apply.

The maximum muzzle velocity of a .30 M-2 AP round is 2760 FPS. To achieve a V-50 of 2900 FPS, the test must have test rounds approaching 3000 FPS. AOA's last test panel showed a V-50 of 2976 FPS at 7.5 PSF. AOA states this clearly indicates that they could have reduced the weight once AOA tested thinner silicon carbide tile which is not an off the shelf item. At the PDR, AOA asked the Government to state which would take precedence if there was a conflict between the dimensions on the drawings, and the actual steel armour received from the Government by AOA (AOA received samples of the steel armour actually taken off existing helicopters by NAVAR as a guideline in designing its armour). AOA was told by Lt. Colonel Bauman that in all cases drawings (blueprints) would take precedence. AOA's KSP-60 armour, tested for Lt. Colonel Bauman at the PDR meeting, was designed and built based upon the NAVAIR supplied information from MIL-A-46099C and the Metal Thickness Chart. AOA's armour was 41% lighter than the steel armour as AOA promised, and exceeded the velocity limits set forth in the MIL spec in the RFQ. The NAVAIR RFQ lists the MIL spec which shows .250 thick steel will stop .30 caliber M-2 AP at 2680 FPS. The Government stated at the PDR that the MIL spec was only a reference. (AOA noted to the Government at the PDR that you can only upload a .30 caliber shell with very special "fast burning" powder – which HP White testing facility has at its' China Lake lab. However, they test with special test barrels to shoot from which have at least ½ inch thick walls.

The ballistics evaluation team selected a bid that was not in line with material specifications, nor drawings since they were in conflict. If one of the reasons the Government

defaulted the contract was because they implied AOA was not following material specifications, then the Government was in breach by providing defective specifications.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Attorneys for Defendant

Dated: October 21, 2005

s/ Cynthia Malyszek
CYNTHIA MALYSZEK, ESQ.
Malyszek & Malyszek
10100 Santa Monica Blvd.
Los Angeles, CA 90067
310-772-2266

Attorney for Plaintiff

Dated: October 21, 2005