**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ARMOUR OFAMERICA | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-1731C |
| | ) | (Judge Marian Blank Horn) |
| v. | ) | |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Per Order dated November 21, 2006, Plaintiff was granted leave to file an amended complaint. Plaintiff, Armour of America, by its undersigned counsel, for its Amended Complaint against Defendant, alleges upon knowledge as to itself and its own acts, and upon information and belief as to all matters, as follows.

## PARTIES

1. Plaintiff, Armour of America (hereinafter "AOA"), 1480 Pumphrey Avenue, Auburn, Alabama 36832, is a corporation organized under the laws of the State of California, with its principal place of business in Auburn, Alabama.

2. The governmental entity of the defendant, the United States, which AOA alleges this complaint against is the United States Naval Air Systems Command (hereinafter "NAVAIR" or "Government"), Building 441, 21983 Bundy Road, Patuxent River, MD 20670-1127.

**JURISDICTION**

3. On June 10, 2004, the Government awarded contract number N00019-04-C-3147, in the amount of $6,038,958.00 to AOA. The contract was for the design, test and manufacture of a Light Weight Armour Replacement System (hereinafter LWARS) for the United States Marine Corps' CH-46E tandem rotor helicopter.

4. On August 26, 2004, NAVAIR issued AOA a notice of termination for default.

5. On September 10, 2004, AOA requested that NAVAIR reconsider the termination for default, claiming that it was improper.

6. On September, 17, 2004, NAVAIR denied AOA's request for reconsideration and refused to convert AOA's termination for default to a termination for convenience.

7. On or about December 15, 2005, AOA submitted a certified claim to the Government for breach of contract, bad faith and breach of the implied contractual duties.

8. On November 28, 2006, the Government stated that it would not render a final decision, and acknowledged and agreed that the Plaintiff would file an amended complaint based on a deemed denial of the claims.

9. Under the Contract Disputes Act, 41 U.S.C. § 605(c)(5), because the contracting officer failed to issue a valid final decision within the time period required, AOA's claim is deemed denied by the contracting officer.

10. The Court of Federal Claims has jurisdiction of Plaintiff's claims under a deemed denial by the Government and an appeal of a default termination pursuant to 28

U.S.C. § 1491(a), and Plaintiff brings these actions pursuant to the Contract Disputes Act, 41 U.S.C. § 601, et. seq.

## STATEMENT OF FACTS

11. AOA realleges each and every allegation set forth in paragraphs 1 through 10 herein.

### Presolicitation/Solicitation

12. On October 6, 2003, AOA received an Advanced Procurement Notification from NAVAIR. The future procurement sought to replace the current armor of the CH-46E helicopter with a lighter weight alternative. Specifically, the new armor system was to provide, at a minimum, a 35% weight reduction and be able to withstand multiple hits from, at least, "V50: 30 cal., 7.62mm round @ 2750 fps at an angle of 0 to +/- 80 degrees." (See Exhibit 00001-00002).

13. On October 9, 2003, NAVAIR issued Presolicitation Notice No. N00019-04-P1-CP002. The presolicitation contained the same requirements, namely, a minimum 35% reduction in weight with a ballistic capability to stop multiple hits of V50: 30 cal., 7.62mm round @ 2750 fps at an angle of 0 to +/- 80 degrees. (See Exhibit 00003-00004)

14. On November 8, 2003, John Nehmens (hereinafter "Nehmens"), General Manager of AOA, requested to be placed on the list to receive the Request for Proposals (hereinafter "RFP").

15. On November 12, 2003, NAVAIR issued a new Presolicitation Notice, No. N00019-04-R-0073, as a small business set aside for the same light weight armor

replacement demonstrating the weight and ballistic capabilities as previously described in paragraphs 12 and 13. (See Exhibit 00006-00007)

16. On December 23, 2003, NAVAIR issued Solicitation No. N00019-04-R-0073 for the CH-64E Light Weight Armor Replacement System LWARS. In Section 4.1, "LWARS Requirements," the solicitation required the LWARS to provide, at a minimum, a 35% weight reduction over the existing armor system; and the LWARS was to be capable of, at least, a V50 ballistic limit of 2900 feet per second against a .30 caliber APM2 threat at a 30 degree angle of obliquity.

17. Page 85 of the Solicitation outlined the Technical Evaluation subfactors. Subfactor B, "Ballistics," stated that the "offeror's proposal will be evaluated to determine that the offeror demonstrates a clear understanding of the ballistics testing requirement of the SOW." This evaluation would include, but not be limited to, the "offeror's understanding of the determination of constant velocity and point of impact ad(sic) obliquity, and the calculation of a ballistic limit."

**Source Selection**

18. On December 23, 2003, Carol A. Tisone (hereinafter "Tisone"), Division Head of the Source Selection Authority, signed off on the Source Selection Plan for RFP N00019-04-R-0073. The Source Selection Plan (hereinafter "SSP") set forth the rules and evaluation criteria for the LWARS RFP. All personnel participating with the Source Selection were required to adhere to the requirements and procedures of the SSP. (See Exhibit 000021).

19. The SSP listed the following individuals, amongst others, as Source Selection Participants:

Competitive Award Panel "Voting" Members:

- Chairperson – Janice Woehrer (hereinafter "Woehrer")
- Program Manager – Lt. Col. Mitch Bauman (hereinafter "Bauman")
- Technical Advisor – John Taylor (hereinafter "Taylor")

Technical Evaluation Team (TET) Members

- Chairperson – Lt. Col. Jon MacCartney (hereinafter "MacCartney")
- Member – Daryl Bughee (hereinafter "Bughee")
- Member – John Gallagher (hereinafter "Gallagher")

Jon Winchester (hereinafter "Winchester") also attended the Source Selection Evaluation board as a non-voting member. (See Exhibit 000046).

20. Section 6(e)(4), Evaluation Guidance, stated that "if the data, facts, or material,(sic) presented are not adequate to determine whether the proposal meets the requirements, the rating should be less than satisfactory. Generally, nothing should be assumed that is not present in the proposal." (See Exhibit 000031)

21. Appendix D of the SSP, as amended, outlined the evaluation factors for award. It listed the following evaluation factors: Weight, Ballistics, Environmental Compatibility, Fit and Technical Capabilities. Appendix D further stated that **"weight reduction is more important than the combined importance of Ballistics, Environmental Compatibility, Fit and Technical Capabilities.**" (emphasis in original). (See Exhibit 000040-000042).

22. On January 22, 2004, NAVAIR issued Amendment 0001 to the solicitation changing various terms in the solicitation. (See Exhibit 00008-000012).

23. On February 4, 2004, NAVAIR issued Amendment 0002 to the solicitation revising the date and time specified for the site visit; revising Section C – Descriptions and Specifications; providing clarification for Q&A #1; and providing a response for an additional question.

24. On February 4, 2004, NAVAIR issued Amendment 0003 to the solicitation to provide additional questions and answers and to provide pictures taken at the site visit held at MCAS. (See Exhibit 000016-000020).

25. On or about February 5, 2004, AOA, a small business concern, submitted its proposal to NAVAIR. (See Exhibit 000048-000076).

26. AOA proposed to supply NAVAIR with AOA's Grade KSP-60 armor. KSP-60 armor would have provided approximately 40% in weight savings with a slight reduction in ballistic capability. The KSP-60 armor also had a multiple hit capability and was able to stop three (3) rounds equally spaced on a 3" circle. NAVAIR's emphasis on weight savings led AOA to conclude that the KSP-60 armor would meet the government's requirements. (See Exhibit 000067-000068).

27. AOA's proposal clearly described the ballistic capabilities of the KSP-60 armor. It stated on Page 2 of Technical Volume II that:

"KSP60 will stop the following rounds:

| | | | |
|---|---|---|---|
| 7.62X39 | Russian/Chinese | Hardcore | @2400 FPS |
| 7.62X54 | Russian/Chinese | Hardcore | @2800 FPS |
| 7.62X51 | NATO | Ball | @2700 FPS |
| 5.56X109 | NATO | Ball | @3300 FPS |
| 5.56X.885 | NATO | Hardcore | @3200 FPS" |

AOA's proposal further guaranteed that its armor would stop impacts ¾" from its edge and on all three-way butt joints. (See Exhibit 000068)

28. AOA' proposal, clearly and unambiguously, did **not** claim to, and in fact did not, meet the V50 .30 caliber at 2900 feet per second threat. (See Exhibit 000068).

29. In an undated Individual Rating Form filled out by Mr. Gallagher, the AOA proposal received an "unsatisfactory" overall rating for ballistics and a "high"

overall proposal risk. (See Exhibit 000084). The Source Selection Plan defines "unsatisfactory" as "[p]roposal does not comply substantially with requirements." The Source Selection Plan defines "high" risk as "[l]ikely to cause *significant* serious disruption of schedule, increase in cost, or degradation of performance, even with special contractor emphasis." (emphasis in original) (See Exhibit 000028). In essence, AOA's proposal received a failing grade for its ballistics.

30. In handwritten notes Mr. Gallagher wrote the following:

- Vendor does not claim to meet RFP requirement (V50 = 2900ft/s for .30 cal APM2).
- Vendor provides test data summaries, but for different threats and at lesser velocities.
- Vendor provides test data for non-AP rounds. Test data is not V50.
- Vendor does not say that they will test IAW with MIL-STD-662, or even at all.
- Angle omitted.
- Unclear what multi-hit threat is.
- Test data to back up ballistics does not meet RFP requirement.
- Vendor does not claim to meet RFP requirement for V50 and test data is not 100% applicable to LWARS (different threat).

31. Mr. Gallagher noted the following omissions:

- Omissions:
  - V50 for RFP threat is omitted.
  - Angle is omitted.
  - Threat for multi-hit is omitted.
  - Qual testing is omitted.

(See Exhibit 000084-000116).

32. Mr. Gallagher's overall summary stated that the "(v)endor's armor does not meet LWARS requirement, from the provided data. Vendor provides test data, but for different threats. Vendor test data is not in V50 form. Vendor omits angle. Vendor does not define threat that armor is multi-hit capable of." (See Exhibit 000116).

33. The Technical Evaluation Team (hereinafter "TET") was aware of, and the Award Panel was put on notice of, the ballistic capabilities of AOA's proposed KSP-60 armor.

34. On February 11, 2004, Amendment 0004 to the solicitation was issued revising the quantities listed under Items 0005 and 0006 of Section B, increasing the number of option kits. (See Exhibit 000117).

35. On February 24, 2004, the TET issued a summary worksheet. AOA received an "unsatisfactory" mark for ballistics from two evaluators and a "marginal minus" mark from one evaluator. (See Exhibit 000118). AOA's overall ballistics rating was "unsatisfactory plus" with a "high" risk rating. (See Exhibit 000118).

36. On or about March 23, 2004, the TET issued Technical Evaluation Summary Reports for all of the offerors. (See Exhibit 000120-000132) . This memorandum was supplied to the Award Panel. (See Exhibit 000133) . AOA received an "unsatisfactory" mark with "high" risk for ballistics. (See Exhibit 000120).

37. Under the section entitled "Ballistics," the report concluded the following:

- **Determination of Constant Velocity**: AOA has failed to provide a test plan or other documentation to demonstrate their ability to design armor to meet the .30 caliber APM2 threat. AOA submitted ballistic test data summaries for different threats (not .30 caliber APM2), at lesser velocities than the LWARS requirement, and not in the V50 format. The TET considers AOA's risk high with(sic) to their ability to determine constant velocity.

- **Point Impact Angle of Obliquity**: AOA failed to provide a test plan or other documentation to demonstrate their ability to design armor to meet the 30 degree angle of obliquity requirement. As such, the TET considers the risk high for AOA to be able to determine angle of obliquity and develop a LWARS that will meet this requirement.

- **Ballistic Evaluation Summary**: AOA failed to demonstrate their ability to determine constant velocity, angle of obliquity, or V50 ballistic limit. Although they state the material for their proposed LWARS has a multi-hit capability of 3

> rounds spaced equidistant in a 3 inch diameter circle, AOA did not qualify this multi-hit capability with the type threat it was tested with nor did they provide a test report on this previous multi-hit testing. Additionally, AOA did not explain how the multi-hit capability will be tested for their proposed LWARS. AOA has not demonstrated a clear understanding of the ballistic test requirements and procedures required to meet the LWARS RFP ballistic requirements. This lack of demonstrated ability **will likely cause some disruption in schedule or degradation of performance**. (emphasis not in original)
>
> (See Exhibit 000122-000123).

38. In their overall technical summary the TET stated that "[i]t is important to note that while AOA does not currently meet the Ballistics requirements of the RFP, the TET believes that AOA will be able to successfully overcome this deficiency through discussion." (See Exhibit 000128).

39. The TET also highlighted the following deficiencies, amongst several others:

- AOA does not state in their proposal that their LWARS will be capable of meeting RFP ballistic requirement.
- AOA fails to mention their qualification plan for determining constant velocity, point of impact angle, and their LWARS ballistic limit.
- AOA did not provide details on their plan to test their proposed LWARS to the multi-hit RFP requirement.

(See Exhibit 000129).

40. On March 26, 2004, Ms. Woehrer, SSEB Chairperson, issued "SSEB Minutes and Recommendations for Lightweight Armor Replacement System (LWARS) Competition." (See Exhibit 000133-000144). Amongst others, Tisone, Woehrer, Gallagher, Bauman, Winchester and MacCartney participated in the meeting. (See Exhibit 000134).

41. The minutes noted that "AOA did not satisfactorily meet the ballistic requirement and has a high risk in this particular factor because they failed to justify or

provide backup data to show how they will be able to meet this requirement." (See Exhibit 000135). The minutes concluded that an award could not be made to AOA at that time "without discussions." (See Exhibit 000143).

42. A slide presentation for the SSEB brief, dated March 26, 2004, notes the following deficiency with AOA's proposal:

- Armour of America does not state in their proposal that their LWARS will be capable of meeting RFP ballistics requirement.

43. On March 29, 2004, Tisone issued a "Source Selection Authority's Determination To Establish Competitive Range, Hold Discussion & Request Final Revised Proposals Solicitation." (See Exhibit 000145-147). Tisone's report also concluded that an award could not be made to AOA "without discussions." (See Exhibit 000146).

44. On April 1, 2004, AOA received a list of 19 discussion questions from the government evaluators. (See Exhibit 000148-000150). Question three (3) specifically asked whether AOA's proposal would meet the Government's ballistics requirements.

45. AOA responded on or about April 7, 2004 by providing the government a copy of Technical Volume IIA. (See Exhibit 000151-000158). In response to Question three (3) AOA submitted the identical list of ballistics it provided in its proposal. AOA's answer to Question three (3) was noted by the TET.

46. On April 30, 2004, NAVAIR notified AOA that there will be no requirement for oral discussions. (See Exhibit 000159).

47. On May 6, 2004, AOA submitted a revised price proposal reducing its prices for the armor ship sets. (See Exhibit 000160-000164). AOA also sought to accelerate the delivery of the ship sets.

48. On May 21, 2004, the TET issued its Final Technical Evaluation Supplemental Reports. (See Exhibit 000165-000167). AOA now received a ballistics grade of satisfactory with high risk. This supplemental report was allegedly based on answers to questions posed to the offerors by the evaluators.

49. The report noted that AOA's answer to Question three (3)[1] consisted of the same ballistic capabilities for AOA's KSP-60 armor that AOA submitted with its original proposal. The report further noted that AOA's ballistics did not meet the .30 cal APM2 threat. For unknown reasons the report also stated that AOA would meet the RFP ballistic requirements.

50. An undated printout of scores indicates that AOA's ballistics evaluation was raised to satisfactory because AOA "provided testing procedures." (See Exhibit 000179).

51. In an undated draft of a Summary Technical Evaluation Report for AOA, edits state that AOA's score is unwarranted because their proposal "does not comply substantially with the other requirements." (See Exhibit 000168-000178). In another set of handwritten, undated, evaluation notes, the different threats and velocities of AOA's proposal are noted. (See Exhibit 000180-000183)

52. On May 21, 2004 Woehrer issued "SSEB Minutes And Final Recommendation For Contract Award Of A Lightweight Armor Replacement System (LWARS)." (See Exhibit 000184-000190). Woehrer made the following observations regarding AOA's Technical Evaluation:

---

[1] Question 3 asked "Provide an assessment of whether your proposed LWARS will meet the Government's ballistics requirements to include documentation, analysis or examples for how your proposed LWARS material will meet the V50 specification."

> "The TET rated AOA's initial technical proposal to be Highly Satisfactory overall with a Medium proposal risk. The TET noted some weaknesses and deficiencies in their proposal, which were, for the most part, satisfactorily addressed during discussion. LtCol MacCartney also stated that several weaknesses continue to exist but that the TET believes that AOA can meet the Government's requirement through increased Government oversight. As a result, the TET made no changes to their original technical proposal rating or proposal risk assessments. AOA's proposed LWARS will result in an aerial density reduction of 41%, which greatly exceeds the 35% aerial density reduction requirement specified in the RFP."

Woehrer's report concluded:

> "Armour of America proposed the highest aerial density reduction at 41% combined with an assigned technical rating of Highly Satisfactory. Although Armour of America received a proposal risk rating of Medium, the TET stated that the risk could be mitigated through the Government's involvement and management of the program. Armour of America's proposed price was the lowest proposed of the four (4) Offerors who received a Satisfactory or better proposal rating. With proper consideration given to the TET, PPET and PET findings, Armour of America's proposal when applied to the RFP evaluation criteria represents the best value to the Government and should receive the award."

53. On May 29, 2004, Tisone issued a "Source Selection Authority's Award Determination for Solicitation N00019-04-R-0073." (See Exhibit 000191). Tisone concluded that:

> "Armour of America proposed the highest aerial density reduction at 41% combined with an assigned technical rating of Highly Satisfactory. Although Armour of America received a proposal risk rating of Medium, the Technical Evaluation Team stated that the risk could be mitigated through close Government's(sic) involvement and oversight of the program. In addition, Armour of America's proposed price was the lowest of the four (4) offerors who received a Satisfactory or better proposal rating. Therefore, with proper consideration given to the evaluation criteria and the evaluation teams' findings, Armour of America's proposal represents the best value to the Government and should receive the award."

**Contract Award**

54. On June 8, 2004, NAVAIR sent AOA the contract to review. NAVAIR informed AOA that NAVAIR's procurement system was shutting down on June 10 and the contract had to be awarded by then or award would have to wait until June 21. (See Exhibit 000192).

55. On June 9, 2004, AOA submitted comments following its review of the contract having only had 24 hours to do so. (See Exhibit 000193-195).

56. On June 10, 2004, the government awarded the contract to AOA. (See Exhibit 000196-000274). The contract listed the same ballistic requirements as the RFP. (See Exhibit 000205).

57. The first deliverables, CLIN 0001 and CLIN 0002, were not due until five (5) months after contract award date, approximately November 10, 2004. (See Exhibit 000216). CLIN 0001 was for "LWARS Non-Recurring Engineering." CLIN 0002 was for the delivery of two (2) Qualification Test Articles.

58. As of contract award AOA understood that it was to provide NAVAIR with ship sets of its KSP-60 armor as described in AOA's proposal.

**Contract Performance/Termination**

59. A Program Management Review (hereinafter "PMR") was held on July 14, 2004. Up to that date NAVAIR never contacted AOA to clarify the discrepancies with AOA's ballistics proposal. NAVAIR never sought assurances from AOA that AOA understood the armor it produced had to meet the .30 cal APM2 threat, despite NAVAIR's knowledge that AOA's proposal did not meet the .30 cal APM2 threat.

60. One week prior to the PMR AOA sent NAVAIR a copy of its presentation. In it AOA again listed the ballistic capability of KSP-60. (See Exhibit 000275-000283). The government did not comment on this.

61. The contract, in section 4.3.1, defined the purpose of a PMR:

> "The contractor shall present their proposed schedule and technical approach for completed efforts under the contract. Review shall include schedule, discussion of key technical elements, introduction of key personnel, establishment of points of contact and risk identification and mitigation factors. The contractor shall prepare and submit meeting minutes in accordance with CDRL 1006. The government anticipates, **at a minimum**, **(1) PMR."** (emphasis not in original)

62. Additionally, in section 4.3.2, the contract contemplated Design Reviews and Technical Interchange Meetings. According to 4.3.2:

> "The contractor shall use design reviews as necessary to review the plans and progress towards meeting LWARS requirements and to assure all success criteria have been met. Design reviews may include technical, logistical or programmatic interests and shall be conducted either at the contractor's facility, Cherry Point, NC or Patuxent, MD. The contractor shall prepare and submit design review minutes in accordance with CDRL A006. The government anticipates, **at a minimum**, **(2) Design Reviews**. (emphasis not in original) Technical Interchange Meetings (TIMS) may be requested by the government or contractor to investigate and resolve specific issues. TIMS may be conducted by telephone, Video Teleconferencing or held at the contractor's facility, Cherry Point, NC or Patuxent River, MD. The government anticipates, **at a minimum**, **(5) TIMS**." (emphasis not in original)

63. At the PMR AOA provided NAVAIR with the armor it had always proposed to supply. For the first time NAVAIR notified AOA that the KSP-60 armor was unacceptable because it did not meet the .30 cal APM2 ballistic threat.

64. AOA was asked at the PMR whether it could produce armor to meet the .30 cal APM2 threat, AOA answered affirmatively. AOA told the NAVAIR representatives that AOA could not give an exact date for when the plates would be

ready, but assured NAVAIR that it would not jeopardize the program. AOA determined it would produce the new armor from Silicon Carbide. The issue of using Boron had come up, however, Boron was too expensive and the supply too short to be reliable.

65. On July 22, 2004, NAVAIR sent a letter to AOA notifying AOA of the minimum armor requirements it expected AOA's armor to meet. (See Exhibit 000288-000289). The armor could have a maximum aerial density of 6.79lbs per square foot and had to meet a .30 cal APM2 2900fps at a 30 degree angle of obliquity ballistic requirement. The Government gave AOA until July 27, 2004 to submit a progress report on its results to NAVAIR.

66. On July 27, 2004 AOA had achieved the following results with its new armor:

- .30 cal APM2 at 30 degrees with a 2731-2783 velocity and weight of 6.7-6.79 pounds.

(See Exhibit 000290) AOA had met the threat and weight requirements; however, the armor missed the velocity requirement by about 120 fps. AOA notified NAVAIR that it was sending panels to be tested by independent laboratory H.P. White. AOA assured NAVAIR that it would meet the QTA delivery date.

67. On July 28, 2004, Gallagher stated in an email that "AOA's test data looks positive in that it is approaching the specified V50." (See Exhibit 000291).

68. On July 30, 2004, NAVAIR issued a Cure Notice to AOA. (See Exhibit 000292-000293). The Notice gave AOA until August 25, 2004, less than one month, to demonstrate the following:

- Demonstrate via an independent laboratory or test facility that the LWARS product meets or is less than the maximum weight of 6.79 lbs/sq ft. Provide test results to substantiate your proposed material is capable of at least V50 ballistic

limit of 2900 feet per second against a .30 cal APM2 threat at 30-degree angle of obliquity.

- Demonstrate that the LWARS product will meet or exceed all other test requirements of the contract, especially Environmental and Vibration requirements. This can be done via actual test data or through preliminary analysis of the proposed material.
- Provide specific detail on maintenance requirements for the LWARS material.
- Provide the samples which have already been tested to PMA-226 for further analysis. The samples requested are those that demonstrated success and which meet or exceed the weight requirements of the contract.
- Provide any information with regard to any enhancements this material may provide over and above the minimum requirements in the original RFP, inclusive of amendments 0001-0004.

The Cure Notice accelerated the delivery dates for CLINs 0001 and 0002.

69. On August 24, 2004, AOA met with NAVAIR to discuss AOA's progress and the H.P. White test results. AOA provided NAVAIR test data showing that AOA's armor was able to stop a .30Cal APM2 at 2891 fps and at a weight of 7.25 psf. (See Exhibit 000302). In a single month AOA had developed a new armor from scratch that was extraordinarily close to meeting contract requirements. AOA also identified to NAVAIR officials several other contract requirements with which AOA was substantially complete, or complete. AOA had: (1) completed all tooling; (2) prepared "loft" data for curved pieces of armor; and (3) prepared a prototype design for floating fasteners. Since any newly developed armor would utilize the same surface AOA currently applied to its other armor, the environmental fitness could be proven by previous testing data.[2] The surface had already been extensively tested and approved by NAVAIR for use on C130 aircraft.

70. At the meeting Nehmens told the NAVAIR representatives that he anticipated having a final piece of armor that met both weight and ballistic requirements

---

[2] The use of the armor on the CH-64 did require some additional environmental testing. AOA agreed to put its new armor through any additional environmental testing.

in 14 days. He expected to only have to test three (3) more panels. At the meeting the Government accused AOA of underhandedness and deceit. The meeting was adjourned and AOA was informed that they would be hearing from the government in a couple days.

71. On August 26, 2004, Woehrer claims to have issued her "Determination To Issue Termination For Default" to AOA. (See Exhibit 000299-000301). However, by Woehrer's own admission, and other documentary evidence, NAVAIR personnel conspired to alter the determination by backdating the signature to mislead the reader into believing it was written prior to the issuance of the default termination.

72. In a September 15, 2004 email, Garrett L. Ressing (hereinafter "Ressing") wrote Woehrer that:

> "Diane has asked me for the backup documentation several times and I keep putting her off. I need to tell her that we got the letter from AOAs (sic) attorneys tomorrow at our weekly staff meeting and I know I am going to get hit yet again with what is our support for the termination.
>
> The longer we wait, the more it looks like we are putting our facts together after the fact to support arguments against the challenge. It really adds to our credibility if we have prepared a memo documenting our consideration of the FAR factors prior to sending the actual termination letter."

(See Exhibit 000294-000296). Woehrer admits to not having the determination done in her reply to Ressing dated September 15, 2004:

> "I am almost finished with the determination memo to the T4D and expect to forward it to my supervisor, Carol Tisone, this afternoon. I will be happy to copy you on it as well if that will help. My target date for completing the memo to address the excusability (sp?) of the T4D is this Friday. After that I will review Tony's recommended response to AOA's appeal letter and hope to complete on Monday. If you would like, I can also forward a copy of the latter two documents at the same time I provide them to Carol."

As of October 7, 2004 a draft of the determination continued to circulate between Ressing and Woehrer.

73. In another email dated September 15, 2004, Woehrer attached a draft of her determination with “additional information” in bold. (See Exhibit 000298) . This “additional information” found its way into her determination dated August 26, 2004, bold font and all. Anthony P. Condurso, Tisone and Julie Matheny received copies of these email exchanges.

74. Woehrer’s backdated determination made the following assertions. In paragraph one (1) Woehrer asserts that an accelerated delivery schedule was a factor in awarding AOA the LWARS contract.

75. In paragraph three (3) Woehrer acknowledges that the AOA proposal did not state that it would meet the ballistics requirements of the contract.

76. Also in Paragraph three (3), Woehrer takes issue with AOA’s failure to provide NAVAIR advance notice of when ballistic tests would be conducted at H.P. White.

77. In Paragraph four (4) Woehrer notes that AOA assured NAVAIR they could meet the ballistic requirements in time. Woehrer also took issue with AOA’s refusal to use Boron.

78. In Paragraph 5(b) Woehrer states that AOA’s failure to perform was based on lack of organization and a “refusal to accept the Government’s minimum requirements.” Woehrer offers no examples of AOA’s alleged disorganization.

79. Woehrer's determination made no mention as to the progress made by AOA in terms of weight or ballistics. The determination made no reference to any technical analysis of AOA's armor or progress.

80. On August 26, 2004, Woehrer sent AOA a Notice of Contract Termination.. (See Exhibit 000303-000307).

81. On September 10, 2004, AOA submitted a request to NAVAIR to reconsider the contract termination. (See Exhibit 000308-000310)

82. In a September 13, 2004 email, Paul Fitzgerald admits to questioning AOA's ballistic performance before the PMR. (See Exhibit 000311-000312).

83. On September 17, 2004, NAVAIR rejected AOA's request for reconsideration. (See Exhibit 000313-000314).

84. On October 28, 2004, Woehrer sent AOA a letter offering to rescind the termination for a payment of $2,099,438 from AOA. (See Exhibit 000315).

85. On or about October 2004, AOA submitted a proposal for the resolicitation of the LWARS contract. NAVAIR excluded AOA's proposal from the final competitive range because AOA's armor was "unsatisfactory" and "will not meet the Government's minimum requirements." (See Exhibit 000316).

**Post Termination Claim**

86. On August 26, 2004, NAVAIR issued AOA a notice of termination for default.

87. On September 10, 2004, AOA requested that NAVAIR reconsider the termination for default, claiming that it was improper.

88. On September, 17, 2004, NAVAIR denied AOA's request for reconsideration and refused to convert AOA's termination for default to a termination for convenience.

89. On December 15, 2005, AOA submitted a certified claim to the Contracting Officer for breach of contract, bad faith and breach of the implied contractual duties.

90. On November 28, 2006, through its counsel, the Contracting Officer stated it would not render a final decision on the certified claim.

**Reprocurement**

92. On November 5, 2004, the reprocured LWARS contract was awarded to ArmorWorks. [redacted] The contract had the same minimum requirements as AOA's contract with the following deliverable dates: (1) the PDR was to be held on December 8, 2004; (2) Qualification Test Articles were due on April 5, 2005; (3) the Qualification Test Report was due on March 9 or 16; and (4) the Critical Design Review (CDR) was to be held on March 23 or 30.

93. The contract had the following requirements:

- Areal density was to be not more than 6.26 lbs/sqft.
- Armor shall meet V50 ballistic limit of 2900 feet per second against .30 caliber APM2 threat at 30-degree angle of obliquity.
- Armor shall be able to withstand multiple ballistic impacts spaced 6 inches apart or greater.
- Composite tile joints and edges of all armor products shall meet the ballistic requirement.

94. Sometime in March 2005, four (4) months after contract award,

ArmorWorks started [redacted]

95. On April 4, 2005, ArmorWorks issued a status report after meeting with NAVAIR. NAVAIR agreed to move the CDR from March to May 18. The report further stated that "Janice [Woehrer]… will modify the contract to reflect date changes which will prevent ArmorWorks from being in default."

96. On May 4, 2005, ArmorWorks issued a status report on the LWARS contract. The report stated that ArmorWorks and [redacted] What this meant was that the armor supplied was no longer required to stop rounds along panel edges and panel joints, significantly reducing the protected area.[3]

97. In a May 12 email Woehrer described the concessions being made by NAVAIR to ArmorWorks:

<u>"Government Concessions:</u>

- We wrote the Qual Test Plan
- Allowing material switch from B4C to SiC
- Removing Tile edge & joint ballistic requirement
- Excusing lateness (for 3 times now i.e original QTA/CDR dates, revised QTA date(s) & revised CDR date)
- Our run-around time scheduling & unscheduling the aircraft for Fit Check
- Excusing lateness for CRDL's (i.e. Parts List, Source data, etc.)"

Woehrer describes what ArmorWorks gave in return:

"<u>AW Concession</u>

- Paint Spec

[3] This would reduce the protected area by about 38%.

- Accelerated Production Delivery Schedule (this is meaningless since they don't adhere to schedules)
- Additional attaching hardware parts
- Reduced price for Production kits only (price is 26% higher than other offeror proposing SIC & they have not offered to reduce the price for the QTA or spares)"

98. Woehrer also made the following observations regarding [redacted]

99. On June 29, 2005, NAVAIR issued contract modification P00002. The modification moved several delivery dates back. The two qualification test systems were due no later than May 12 and July 19 and the CDR was moved from March to August 9, 2005.

100. On or about August 11, 2005, NAVAIR issued contract modification number P00003. [redacted]

101. On September 19, 2005, NAVAIR issued contract modification number P00005. As of this modification ArmorWorks had not met all of the ballistic requirements in the contract. [redacted]

102. As of September 19, 2005, it is also unclear as to whether ArmorWorks met the multiple hit requirement. [redacted]

## FIRST CAUSE OF ACTION

## GOVERNMENT BREACH OF CONTRACT DUE TO BAD FAITH AND ABUSE OF DISCRETION

103. AOA realleges each and every allegation set forth in paragraphs 1 through 102 herein.

104. The Government administered and terminated AOA's contract is bad faith and abused its discretion by:

a. awarding the contract to AOA knowing a patent ambiguity existed with AOA's bid;

b. by awarding AOA a contract despite their non-conforming bid;

c. ignoring their own recommendations to mitigate "weaknesses" in AOA's proposal;

d. exercising its power in an arbitrary, capricious and unreasonable manner following the PDR;

e. unreasonably and arbitrarily evaluating AOA's progress; and

f. backdating and falsifying documents to justify its decision to issue a default termination to AOA.

105. The reprocurement contract and the Government's actions and several modifications concerning the reprocurement show that the Government abused its discretion and acted in bad faith regarding the contract with AOA.

106. As a result of the Government's bad faith conduct AOA was wrongfully terminated for default and has unavoidably incurred compensable damages.

## SECOND CAUSE OF ACTION

## GOVERNMENT'S BREACH OF THEIR DUTY TO COOPERATE AND NOT HINDER PERFORMANCE

107. AOA realleges each and every allegation set forth in paragraphs 1 through 106 herein.

108. The Government's actions and omissions under this contract breached their duty to cooperate and not to hinder performance by:

a. ignoring their own recommendations to mitigate "weaknesses" in AOA's proposal;

b. exercising its power in an arbitrary, capricious and unreasonable manner following the PDR;

c. unreasonably and arbitrarily evaluating AOA's progress; and

109. As a result of the Government's breach of their duty to cooperate and thus hindering performance AOA was wrongfully terminated for default and has unavoidably incurred compensable damages.

## THIRD CAUSE OF ACTION IMPROPER DEFAULT TERMINATION

110. AOA realleges each and every allegation set forth in paragraphs 1 through 109 herein.

111. AOA was not in default under the contract because AOA had not missed a single delivery date and had substantially performed its duties under the contract at the time of termination.

112. Any difficulties encountered during performance of the contract were caused by the Government's own acts of bad faith.

113. As a result of the Government's improperly terminating AOA's contract for default, its bad faith and abuse of discretion, AOA suffered compensable damages.

## PRAYER

WHEREFORE, Plaintiff by its counsel, respectfully requests that this Court:

1. grant judgment against the United States in the amount of $3,029,833.00, plus allowable interest per the Contract Disputes Act,

2. grant judgment in Plaintiff's favor finding that Defendant improperly terminated the contract for default and convert termination for default to one for convenience;

3. award costs, attorney fees, and such other relief as the Court deems proper.

Respectfully Submitted,

s/ Cynthia Malyszek
CYNTHIA MALYSZEK
Malyszek & Malyszek
2029 Century Park East
Suite 1400
Los Angeles, CA 90067
310-772-2266
310-772-2265 Fax

Dated: December 5, 2006

Attorney for Plaintiff