**Technical Sub-factor Evaluation Summary:**

The following provides a summary of the Technical Evaluation Team's findings for each sub-factor, including the areas of particular emphasis specified in the solicitation and the strengths, weaknesses and deficiencies, if applicable, associated with each.

**Weigh Reduction:**

- **Ability to Meet or Exceed the Required minimum of a 35% reduction in the aerial density over the existing metallic armor system as specified in the SOW:** AOA has selected KSP-60 as the armor material for their LWARS. Use of this material is expected to exceed the SOW weight reduction requirement with an anticipated aerial density reduction of 41% (based on an armor aerial density of 10.44 pounds per square foot (psf)). AOA's proposed LWARS will have an aerial density of 6.1 psf, which will yield an overall weight decrease of 208 lbs. over the current CH-46E armor. However, AOA failed to provide any documentation or analysis to show that this material has successfully passed qualification testing. Risk is increased

- AOA states that KSP-60 has been supplied to other rotory wing manufacturers. However, no data was provided in their proposal to identify the armor weight for these other programs

**Weight Reduction Evaluation Summary:**

AOA's proposed LWARS is anticipated to have an aerial density of 6.1 psf. Which, when compared to the current CH-46E armor aerial density of 10.44 psf, will result in a decrease in aerial density of 41%. AOA's weight reduction approach for LWARS exceeded the SOW requirements using a medium risk approach. While AOA did not submit specific armor layering information to support their aerial density estimate or a plan for testing the weight reduction, AOA states they have previously supplied this material to five rotary wing manufacturers. This increases AOA's viability and credibility for successful program execution. These findings led the TET to assign an overall rating of **Outstanding** with **Medium** risk for this sub-factor.

**Ballistics:**

- **Determination of Constant Velocity:** AOA failed to provide a test plan or other documentation to demonstrate their ability to design armor to meet the .30 caliber APM2 threat. AOA submitted ballistic test data summaries for different threats (not .30 caliber APM2), at lesser velocities than the LWARS requirement, and not in the V50 format. The TET considers AOA's risk high with to their ability to determine constant velocity.

- **Point Impact Angle of Obliquity:** AOA failed to provide a test plan or other documentation to demonstrate their ability to design armor to meet the $30^0$ angle of obliquity requirement. As such, the TET considers the risk high for AOA to be able to determine angle of obliquity and develop a LWARS that will meet this requirement.

NAV13598

- **Calculation of a Ballistic Limit:** AOA states they have experience in designing armor. However, this experience is based on meeting threats other than the .30 caliber APM2 threat specified for LWARS. AOA's proposed LWARS will have a ceramic tile strike face, which has a high hardness that is used to tumble the projectile. AOA states their ceramic tile is backed by Kevlar and Spectra, which captures the round. The Kevlar material also adds strength. It is a well-known industry fact that non-environmentally protected Kevlar absorbs moisture, which decreases its ballistic capability. AOA did not address environmentally protecting their Kevlar-backed LWARS, which significantly increases program risk. Additionally, they failed to provide any documentation to demonstrate their ability to calculate the ballistic limit of their proposed LWARS as well as their multi-hit capability. AOA also failed to address whether they will conduct ballistic testing on their armor IAW MIL-STD-662 or any other industry standard. The TET considers this lack of information to be a deficiency that could significantly impact AOA's ability to successfully meet the RFP requirement.

**Ballistic Evaluation Summary:**

AOA failed to demonstrate their ability to determine constant velocity, angle of obliquity, or $V_{50}$ ballistic limit. Although they state the material for their proposed LWARS has a multi-hit capability of 3 rounds spaced equidistant in a 3 inch diameter circle, AOA did not qualify this multi-hit capability with the type threat it was tested with nor did they provide a test report on this previous multi-hit testing. Additionally, AOA did not explain how the multi-hit capability will be tested for their proposed LWARS. AOA has not demonstrated a clear understanding of the ballistic test requirements and procedures required to meet the LWARS RFP ballistic requirements. This lack of lack of demonstrated ability will likely cause some disruption in schedule or degradation of performance. These findings led the TET to rate this sub-factor as **Unsatisfactory** with **High** risk.

**Environmental Compatibility:**

- **Vibration:** AOA states that their proposed LWARS has successfully passed vibration testing IAW MIL-STD-810, although the testing, as stated in their proposal, was conducted under different conditions (higher frequencies and different displacements) than the LWARS RFP requirements. Additionally, no supporting documentation was provided in their proposal to substantiate their claim that their proposed LWARS material has successfully passed any vibration testing. AOA further states that they will conduct the additional required vibration testing of their LWARS IAW MIL-STD-810. However, AOA failed to provide the method or procedures they will utilize to verify their proposed LWARS will meet this requirement. Risk is increased.

- **Temperature:** AOA states that the material they will use for their proposed LWARS has successfully passed temperature testing that will fulfill the LWARS RFP requirement. However, no supporting documentation was provided to substantiate that their proposed LWARS material has successfully passed any temperature testing. AOA states in their proposal they will test to the temperature requirement in the RFP utilizing MIL-STD-810 as a guide, although they did not state the process/method they will utilize to conduct this testing. Risk is increased

NAV13599

- **Acceleration:** AOA failed to demonstrate a clear understanding of the test procedures required to meet the RFP acceleration testing requirements. AOA's qualification testing has yet to be determined, and there is no mention in there proposal of following MIL-STD-810 guidelines or any other industry-accepted method for acceleration testing. They also failed to provide the results of any previous acceleration testing to demonstrate compliance with the RFP requirements. Risk is increased.

- **Fluid Resistance:** AOA states that their proposed LWARS material has successfully passed fluid compatibility testing conducted by an independent laboratory for JP-5, hydraulic fluid and cleaning solvents, but this previous testing does not meet the LWARS RFP requirement. Additionally, no supporting documentation was provided in their proposal to substantiate their claim that their proposed LWARS material has successfully passed any temperature testing. AOA states they will conduct the additional required fluid compatibility testing specified in the RFP IAW MIL-STD-810, although they did not state the process/method they will utilize to conduct this additional testing. Risk is increased.

- **Humidity:** AOA states their proposed LWARS material has successfully passed humidity testing IAW MIL-STD-810, but this previous testing does not meet the LWARS RFP requirement. Additionally, no supporting documentation was provided in their proposal to support the claim that their proposed LWARS material has successfully passed any humidity testing. In order to fill data gaps between their existing data and the RFP SOW requirements, AOA states in their proposal that they will conduct the additionally required humidity testing of their proposed LWARS IAW MIL-STD-810, although they did not state the process/method they will utilize to conduct this additional testing. Risk is increased.

- **Salt Spray/Fog:** AOA states their proposed LWARS armor has already successfully undergone salt spray/fog testing IAW MIL-STD-810, although test results were not provided. AOA states they will conduct the additional required fluid compatibility testing specified in the RFP IAW MIL-STD-810, although they did not state the process/method they will utilize to conduct this additional testing. Risk is increased.

**Environmental Compatibility Evaluation Summary:**

AOA states they have experience with environmental testing on their proposed LWARS material, which was used on another AOA armor product. While it appears that much of the RFP required testing is covered by AOA's previous testing efforts, this testing does not completely meet the RFP environmental compatibility requirements. Additionally, the testing report provided in their proposal is incomplete and does not cover any of the testing methods, criteria utilized, or results of the testing. It merely states that testing by Environmental Associates, Inc. was conducted. However, despite the lack of supporting documentation, the TET believes that AOA has an adequate understanding of test procedures required to meet the LWARS environmental compatibility requirements. These findings led the TET to rate this sub-factor as **Satisfactory** with a **Medium** risk.

**Fit:**

NAV13600

- **Mate to Existing CH-46Eb Airframe without Modification:** AOA states they will drill holes in their proposed LWARS armor to meet armor drawings and aircraft attachment locations. However, AOA does not provide detailed information in their proposal to show how the armor will actually mate so it is unclear whether aircraft variation can be accommodated. Additionally, AOA states they will require a set of current aircraft armor during the initial stages of the program. This should have minimal impact on the Fleet, but will require approximately 40 FST man hours to verify what differences exist, if any, between the GFE aircraft armor and the existing drawings to ensure the Government is aware of any issues with the Fleet armor prior to issuing it to AOA. AOA did not state in their proposal, page 8 last paragraph, their intent for this additional GFE. Risk is increased.

- **Same or Better Accessibility:** AOA states their proposed LWARS armor will have greater accessibility due to their panels' reduced weight but did not specify their proposed attachment method. Based upon the lack of information in their proposal, AOA did not satisfactorily demonstrate they will be able to meet the accessibility requirement during the qualification tests. Risk is increased.

- **Dimensionally Meet Existing Drawings:** AOA states they will ensure their proposed LWARS will meet the dimensional requirements by using production tooling, molds, and templates. AOA will also use the GFI drawings for the mounting hole locations and armor dimensions, as well as survey aircraft to determine variance in actual dimensions of Fleet aircraft. The TET believes it will be necessary to conduct these measurement surveys with the armor installed and removed on a number of aircraft. This is estimated by PMA-226 APMSE to take approximately 3 hours per aircraft by Fleet maintenance personnel to remove and reinstall the armor and will require approximately 10 aircraft for a statistically relevant sample. This additional aircraft measurement will potentially add 3-4 weeks to the NRE portion of the program. This equates to approximately 40 man-hours of FST support to facilitate data collection and interpretation and operational aircraft down time, which can be minimized by selecting Fleet aircraft that are in a non-flyable status. AOA has satisfactorily demonstrated that their proposed LWARS will meet the existing GFI armor drawing dimensions.

- **Require No Additional Maintenance after Installation:** AOA states they anticipate no scheduled maintenance other than visual inspection, cleaning and paint touch-up as required, which is consistent with the current CH-46E aircraft armor. However, the TET believes composite armor will require special care and handling that the Fleet currently does not consider or perform with the current metallic armor during removal, reinstallation, and storage. Also, composite material usually must undergo some form of NDI inspection after some interval, which AOA will have to address in their maintenance plan to ensure the structural soundness of the material. AOA offers a maintenance package to inspect the LWARS armor every 5 years in order to address inspection but did not state whether this cost was included in their price proposal. AOA did not address reparability in their proposal.

**Fit Evaluation Summary:**

NAV13601

AOA's Fit plan lacks key information that increases their risk. Although they state that in their proposed LWARS will make accessibility easier, they did not provide sufficient justification to validate this statement. Additionally, AOA states they require aircraft mounting bracket and armor mounting hole measurements be taken during the NRE. This will likely increase cost and schedule for the program to some extent based on the support that will be required by the Government engineers (approximately 40 man-hours) and Fleet maintenance support (approximately 3 man-hours per aircraft) as well as approximately 3-4 weeks to accomplish approximately 10 aircraft. However, selecting Fleet aircraft that are in a non-flyable status can minimize risk.

AOA did not fully explain their attachment concept in their proposal, but did state they will existing hole locations. However, it is unclear whether their attachment concept will accommodate aircraft variation. AOA also states that their proposed LWARS will require no additional maintenance after installation. They also offer a maintenance package to inspect the armor on a 5-year basis, but did not mention if this will be a requirement in their maintenance plan or if it is merely an option they will provide at additional cost to the Fleet. These findings led the TET to rate the sub-factor as **Satisfactory** with a **Low** risk.

**Technical Capabilities:**

- **Capability to Transition from Prototype to Production:** AOA states their experience on other armor programs will be an asset in transitioning from prototype to production. They further cite their program management skills, supplier teaming, manpower, scheduling ability, quality assurance and experience as helpful factors in successfully transitioning. AOA states the teaming arrangement with their suppliers eliminates long lead items and they can ramp-up their skilled workforce in 2 weeks. However, they do not provide a schedule or state the need for design-review meetings. The TET believes AOA has the ability to transition from prototype to production. However there is some risk since AOA failed to provide supporting documentation from their other programs to show how they successfully transitioned from prototype to production.

- **Manufacturing Process, Facilities, Resources, and Parts Supply:** AOA described their manufacturing process as: cutting the Kevlar/Spectra backing and ceramic tiles; combining the Kevlar/Spectra, tiles and resin in a mold; applying pressure to cure the panel; painting. AOA further states they conduct oversight of all their ongoing programs through a functional matrix vice a program manager to adjust schedule and manpower to support required production and delivery schedules. The TET believes this management method increases AOA's risk for producing their LWARS on cost and schedule. They also state they have ballistic test capability at an in-house test range. According to their proposal, AOA has established material supply arrangements with all their suppliers (to include Spectra, Kevlar and the ceramics). However, based on the supply methods identified in their proposal, there is some risk to AOA producing LWARS on schedule due to the following: 1) they do not order supplies until needed on the manufacturing floor (just in time supply); 2) they only list one supplier for each of their key LWARS materials in their proposal; 3) they state they adjust required supplies on a yearly basis if required. AOA satisfactorily addressed their manufacturing process, resources, and parts supply capabilities but there is some amount of risk for the reasons cited above.

- **Recognition of Technical Risk Areas:** AOA has identified several areas of potential risk to include: rigidity of armor panel, environmental testing gaps/shortfalls, and LWARS dimensional accuracy. They did not however recognize the technical risk in meeting the LWARS ballistic requirements (they do not currently meet the requirements based on the test data they submitted in their proposal).

- **Development of Mitigation Plans:** AOA states they will use Kevlar in the armor panel construction to add rigidity; will environmentally test to fill any gaps in previously conducted environmental testing; will use drill jigs to ensure manufacturing accuracy of panel holes and will survey several aircraft to compare to GFI drawings. However, they failed to address the risks associated with their ballistic testing to meet the RFP requirements and their plans to mitigate this risk.

- **Quality Assurance Considerations:** AOA states they are ISO-9001 certified. Their manufacturing process (e.g. drilling) has tight tolerance controls; and they warranty their armor for ballistic impact properties. Quality control during or at the end of the manufacturing process to ensure a quality armor panel was not addressed. AOA does offer an x-ray process as part of the maintenance package to inspect armor panels for cracks, voids and physical defects. However, they did not state whether this x-ray process is included in their proposed cost.

- **Corrective Action Processes:** AOA failed to address their corrective action processes.

- **Supplier Quality Assurance:** AOA failed to address supplier quality assurance.

- **Configuration Management:** AOA failed to address configuration management.

- **Use of GFE/GFI:** In addition to the GFE/GFI provided for the RFP, AOA states they need to survey aircraft to determine variance in actual dimensions of Fleet aircraft, which the TET believes requires measurements with armor installed and removed on a number of aircraft. This is estimated by PMA-226 APMSE to take approximately 3 hours per aircraft by Fleet maintenance personnel to remove and reinstall the armor and will require approximately 10 aircraft for a statistically relevant sample. This additional aircraft measurement will potentially add 3-4 weeks to the NRE portion of the program, which equates to approximately 40 man-hours of FST support to facilitate data collection and interpretation and operational aircraft down time, which can be minimized by selecting Fleet aircraft that are in a non-flyable status. Additionally, AOA states they will require a set of current aircraft armor during the initial stages of the program. This should have minimal impact on the Fleet, but will require approximately 40 FST man hours to verify what differences exist, if any, between the aircraft armor and the existing drawings to ensure the Government is aware of any issues with the armor prior to issuing it to AOA. AOA states they will utilize the provided MIL-STD-810 as a guide for environmental testing, and will utilize all the drawings of the current armor. However, they do not state they will use MIL-STD-662 for guidance or any other industry-accepted standard during ballistic testing.

**Technical Capability Evaluation Summary:**

NAV13603

AOA has demonstrated they have adequate production facilities; resources and a supply plan to facilitate a successful LWARS program. However, AOA has marginally addressed their capabilities to transition from prototype to production, assure quality and identify/mitigate risks in order to facilitate a successful LWARS program. Further, AOA failed to address configuration management, supplier quality assurance and corrective actions processes. These findings led the TET to rate the sub-factor as **Marginal** with a **Medium** risk.

**Overall Technical Summary:**

AOA's technical proposal was lacked specific detail in some areas, which increases program risk. However, the TET believes that AOA has clearly demonstrated that they understand the requirement and are capable of meeting the LWARS requirements specified in the RFP. Their weight reduction approach exceeds the RFP requirement using a medium risk approach. It is important to note that while AOA does not currently meet the Ballistics requirements of the RFP, the TET believes that AOA will be able to successfully overcome this deficiency through discussions. In addition, AOA states they will conduct environmental compatibility testing to meet the RFP requirements but failed to provide any documentation to show that this testing was successfully conducted previously through an independent laboratory. AOA states they require aircraft mounting bracket and armor mounting hole measurements be taken during the NRE phase of the effort. This could increase cost and schedule for their LWARS program but risk can be minimized by selecting Fleet aircraft that are in a non-flyable status. Additionally, AOA states that no additional maintenance is required after installation but the TET believes that composite armor will require special care and handling that is not performed for the current metallic armor and it is known industry-wide that composite armor must undergo some form of NDI testing. AOA has demonstrated they have adequate production facilities and resources to facilitate a successful LWARS program but failed to provide information to demonstrate their understanding or experience with configuration management, supplier quality assurance and corrective actions processes. With proper consideration to the Weight Reduction sub-factor, the TET assigned **Armour of America** an overall Technical Rating of **Highly Satisfactory** with **Medium** Risk.

**Strengths:**

- AOA's proposed LWARS will have a anticipated aerial density of 41% which exceeds the RFP requirement by 6%.
- AOA states they have previously supplied armor to five rotory wing manufacturers.
- AOA states their proposed LWARS material has successfully passed multi-hit testing and demonstrated a capability of stopping 3 shots inside a 3-inch diameter circle although the threat was undefined
- A reputable independent third party IAW MIL-STD-810 has conducted some environmental testing of their proposed material.
- AOA states in their proposal they can quickly ramp-up workforce and raw materials.

**Weaknesses:**

- Armor layer details (e.g. thickness, density) were not provided in the AOA proposal.
- AOA does not state intent to conduct qualification weight test.

- AOA states the material proposed for their LWARS has undergone multi-hit testing but they failed to identify the threat utilized in this previous testing.
- Previous vibration testing was conducted on AOA's proposed LWARS material but was conducted at a different frequency from that required in the RFP
- AOA's method for mounting/attaching the armor to the aircraft is not sufficiently detailed
- AOA states in their proposal they will match drill their LWARS fastener holes to ensure aircraft fit, which makes their LWARS tied to a specific aircraft and limits Fleet flexibility.
- As stated in their proposal, the AOA maintenance plan is unclear – what needs to be done between the 5 year inspections
- It is unclear in their proposal whether x-ray inspection process will also be used during production process
- AOA's proposal failed to address MIL-STD-662 or other industry standard.

**Deficiencies:**

- AOA does not state in their proposal that their LWARS will be capable of meeting RFP ballistics requirement
- AOA fails to mention their qualification plan for determining constant velocity, point of impact angle, and their LWARS ballistic limit.
- AOA did not provide details on their plan to test their proposed LWARS to the multi-hit RFP requirement.
- AOA failed to provide an overall environmental compatibility testing plan for meeting the vibration, temperature, acceleration, fluid resistance, humidity, and salt spray/fog requirements of the RFP.
- AOA states in their proposal their acceleration testing is TBD and did not provide data, analysis, or an estimate of whether their proposed LWARS material will meet the acceleration requirement of the RFP.
- AOA did not discuss the method they will use to mount their LWARS to the aircraft.
- Reparability of their LWARS is not stated in their proposal.
- AOA does not provide in their proposal a prototype to production schedule.
- AOA failed to address configuration management, supplier QA, or a corrective action process as required by the RFP.

**Discrepancies/Omissions:**

- Using 11 psf as aerial density of CH-46 armor (RFP states 10.44 psf)
- AOA's aerial density reduction for their proposed LWARS as stated in their proposal on page 1 (61%) and page 2 (62%) differ.
- Ballistics section missing from AOA's technical proposal on copies 2-7.

NAV13605

**OFFEROR: Armou. _/ America**

## Overall Risk Rating: LOW

In the armour business since 1972, Armour of America products include personnel body armor and seat, floor, panel armor for the C-130, P-3 aircraft and AH-60 helicopters. The offeror has provided two contracts for use by the PPET. Of these two, only one could be evaluated as detailed below.

PPIRS did not contain any records for the offeror under the name of Armour of America, cage code 61170 or DUN 07-722-9144. Past performance information obtained from the offerors proposal data and the references provided for each contract were used to arrive at the overall rating for this offeror. References were contacted by telephone and email and asked to complete a past performance questionnaire. Evaluator also used the Internet to search for offeror products, news releases, contract award announcements, etc. The specific details of the evaluator's findings are included in the attached documentation and were used to arrive at the overall rating for this offeror. A summary of these findings is as follows:

**- Contract number and title: W911S8-04-F-0037, Fragmentation Armour for HMMWV**
**- Procuring agency: ACA Director of Contracting, Fort Lewis**
**- Dollar value of contract: $7,035,574**
**- Period of performance: Dec 2003 - Mar 2004**

Armour of America is under a firm, fixed price contract with ACA for the design and production of ballistic/fragmentation armor for the floor and doors of the HMMWV (Humvee) 2 ½ and 5-ton truck, HEMMT wreckers and tactical tents. This is a short-term contract, which requires 9 unique kits delivered within 60 days that can be installed in the field. The HMMWV is the High Mobility Multi-purpose Wheeled Vehicle used by the US Army. The relevance of this contract to the CH-46E LWARS is HMMWV armour development and manufacture and weight reduction efforts, which is similar to the CH-46E effort. Attempts were made to conduct telephone interviews with reference listed in proposal, Ms. Sandra Williams, SESG Director of Contracting, but evaluator was not successful. Ms. Williams' voice mail states she will be out of the office for the next 12 months. An alternate phone number was not given. Contract was recently awarded; overall performance on this contract was not identifiable and graded **Unknown.**

1. Meeting Technical (Delivering Quality Products) Requirements: The offeror is required to design, manufacture and start delivery of kits within a sixty (60) day timeframe. Contract was awarded 11 Dec 2003. The offeror visited the field to review and create detailed plans for the incorporation of the armor. Installation instructions, which included drawings and photos, were also developed for the field level. There was no identifiable Technical/Quality performance record for this contract.

2. Meeting Schedule Requirements: This contract requires deliveries of 372 kits to Fort Bragg, 1,334 kits to Baghdad and 1,821 kits to Fort Lewis. Offeror stated that partial deliveries would be sent to all three locations to allow for product flow. There was no identifiable Schedule performance record for this contract.

**NAV13606**

**OFFEROR: Armou. i America**

3. Controlling Contract Cost/Price: Contract is firm, fixed price. There was no identifiable cost/price performance record for this contract.

4. Managing Contract Effort on Similar Program: There was no information provided on contracting efforts on similar programs.

5. PPIRS Information: Not available for this contract effort.

**- Contract number and title: GS-07F-9451G, C-130 Ballistic Armour**
**- Procuring agency: NAVAIR Patuxent River**
**- Dollar value of contract: $11,000,000**
**- Period of performance: Mar 2002 - Dec 2003**

Armour of America is under contract with NAVAIR for the design and manufacture of Ballistic Armour kits for the floor and fuselage of the C-130 flight deck. This contract required all ballistic panels to be molded precisely for interchangeability between all C-130 aircraft. Included in the contract was the armoring of the forward radome bulkhead and liquid oxygen bottle. The relevance of this contract to the CH-46E LWARS is C130 ballistic armour design and manufacture and weight reduction efforts, which is similar to the CH-46E effort. Attempts were made to contact references listed in proposal, but evaluator was not successful. Evaluator was directed to Mr. Al Guidary, NAVAIR contracts, (504) 678-5912. Past performance questionnaires were completed by Mr. Al Guidary, NAVAIR PCO and Mr. Matt Williams, NAVAIR Technical (PMA 207). Respondent, Mr. Guidary, describes the effort as the procurement of ballistic armour for the C-130T/KC-130T aircraft and referenced contract number N00140-03-F-M810 and M003, period of performance July 2003 through October 2003. Respondents graded the offeror's overall performance for this contract effort as **Excellent - Exceptional.**

1. Meeting Technical (Delivering Quality Products) Requirements: Offeror demonstrated compliance with technical requirements, which called for interchangeability between all C-130 aircraft. This was accomplished by the development of templates for the floor panels to allow for location of mounting strips. Mr. Guidary stated the offeror was very responsive to all requirements and continue to assist where required. The offeror has a good reputation for knowing the equipment and how to install it. Mr. Williams stated the offeror was willing to modify and/or amend their product to accommodate government needs. Technical issues were addressed and corrected in minimal time with some additional expense. Respondents graded the offeror's technical and quality performance as **Excellent - Exceptional.**

2. Meeting Schedule Requirements: This contract required deliveries to eight different air stations of 56 ship sets. This included one delivery to Japan. Initial requirement by NAVAIR was 6 ship sets a month. Dealing with eight different air bases and trying to fulfill everyone's requirement, the contractor management pursued and effort to establish an allocation schedule based on deployment requirements. Offeror stated an on time delivery of 98%; only one aircraft did not receive their kit on time, but the contractor compensated by shipping one each kit express freight. Respondent states meeting schedule requirements is one of the offeror's strong points.

**OFFEROR: Armou. .i America**

Mr. Williams reported the late delivery was attributed to FED EXP losing the item. Respondents graded the offeror's schedule performance as **Excellent - Exceptional.**

3. Controlling Contract Cost/Price: Respondent states the offeror is on target all of the time. Mr. Williams graded contract cost/price performance as Exceptional

4. Managing Contract Effort on Similar Program: Offeror states a contract was awarded with Boeing for the design and prototype of liquid oxygen bottle armouring for the C-17 aircraft. Prime contract is between Boeing and the US Air Force as part of the major aircraft modification. Specific contract details were not provided. After prototype, the offeror expects a production contract for the delivery of 180 ship sets. Respondent states the offeror handles difficult situations with professionalism. Sites an instance where DFAS was slow in paying, but offeror took it in stride and with tolerance.

5. PPIRS Information: Not available for this contract effort.

OTHER INFORMATION: The evaluator researched PPIRs and the Internet in an unsuccessful attempt to find past performance records for this offeror that were either directly related or similar in scope, magnitude, and complexity to the requirements of the solicitation. No contracts other than those listed as references were evaluated or reviewed.

Performance Risk Assigned: The offeror provided two contracts that were similar in scope, magnitude and complexity to the requirements of the solicitation. One contract, for HMMWV armour development and manufacture, was recently awarded and not enough time had elapsed to rate contract performance. On the other contract, the offeror has demonstrated their products and services were delivered in accordance with contract requirements, on schedule and within costs. No quality issues or product delivery issues were reported. The offeror demonstrated past performance in production of armor systems for the C130T/KC130T aircraft that are similar to the CH-46E LWARS. Based on the offeror's performance and systemic improvement record, little doubt exists that the offeror will successfully perform the required effort. A risk rating of **Low** has been assigned.

NAV13608

From: Janice E. Woehrer (AIR-2.4.3.3), SSEB Chairperson
To: Carol Tisone (AIR-2.4.3), SSA

Subj: **SSEB MINUTES AND RECOMMENDATION FOR LIGHTWEIGHT ARMOR REPLACEMENT SYSTEM (LWARS) COMPETITION – RFP# N00019-04-R-0073**

Encl: (1) Technical Evaluation Team (TET) Reports
(2) Past Performance Evaluation Team (PPET) Reports
(3) Price Evaluation Team (PET) Reports

1. **Background:** The solicitation was issued on 24 December 2003 and closed on 10 February 2003. Three amendments were issued prior to the closing date to clarify the proposal instructions and make minor changes to the solicitation terms and conditions. A fourth amendment was issued after proposals were received to clarify the CLIN descriptions to accurately reflect a more realistic procurement strategy. At the time of closing, 10 proposals were received from nine different contractors: ArmorWorks, Tempe, AZ; Armour of America, Beverly Hills, CA; Hardcore Composites, New Castle, DE; M-Cubed Technologies (submitted two (2) different proposals), Newark, DE; Meggitt Armor Systems, Berkshire, UK; Mide' Technolgy Corporation, Medford, MA; Neptune Precision Components, Jacksonville, FL; Protective Materials Company, Miami Lakes, FL; and Vertical Horizons One, Inc., Newark, OH. The proposal evaluations were conducted 11 February 2004 – 25 March 2004. The Source Selection Evaluation Board (SSEB) was convened on 26 Mar 2004 to review and consider the results of the Technical, Past Performance, and Price Team evaluations for the purpose of determining whether award could be made on initial offers received or, if not, to establish a competitive range and hold discussions. As a result of these deliberations, the SSEB unanimously agreed that a competitive range should be established and discussions held with six (6) of the Offerors. The circumstances and rationale that led to the SSEB's recommendation are set forth below. The specific details of the TET, PPET and PET evaluations are set forth in enclosures (1), (2) and (3).

2. **Evaluation Criteria**: The solicitation specified three evaluation factors: Technical, Past Performance, and Price. The Technical, Past Performance and Price factors are of equal importance. When combined, the Technical and Past Performance factors are significantly more important than Price. The technical evaluation subfactors were: Weight Reduction, Ballistics, Environmental Compatibility, Fit and Technical Capabilities. Weight Reduction is more important than the combined importance of Ballistics, Environmental Compatibility, Fit and Technical Capabilities. Ballistics, Environmental Compatibility, Fit and Function and Technical Capabilities are of equal importance.

3. **SSEB Membership & Protocol**: Ms. Woehrer, SSEB Chairperson and PCO for the LWARS procurement, began the meeting by ensuring that all attendees had signed a non-disclosure statement. Ms. Woehrer explained that the responsibility of the SSEB would be to determine if contract award could be made on initial offers or if a competitive range needed to be determined with discussions to be held. She then proceeded with identifying the companies who had responded to the solicitation, introduced the SSEB attendees and explained their roles. Those in attendance at Patuxent River were:

Ms. Carol Tisone, AIR 2.4.3, SSA
Ms. Janice E. Woehrer, AIR 2.4.3.3 (PCO), SSEB Chairperson & Voting Member
Mr. Anthony Condurso, AIR 11.1, Office of Counsel, Advisor
Mr. John Gallagher, AIR 4.1, TET Member
Ms. Julie Matheny, AIR 2.4.3.3.2, PET Chairperson
Ms. Melanie Bateman, AIR 2.4.3.3.4, Recorder

Those in attendance via VTC in Cherry Point, NC were:

LtCol Mitchell Bauman, PMA-226, Voting Member
Mr. John Taylor, H-46 FST.0/AIR-4.1.1, Voting Member
Mr. Jon Winchester, PMA 226, PET Member
LtCol Jon MacCartney, TET Chairperson
Ms. Trish Butler, PMA-226/AIR-1.1.4.1, PPET Chairperson

Ms. Woehrer noted that once the SSEB was concluded, no discussion of information in reference to this solicitation/proposal evaluation should take place in accordance with FAR 3.104. She further stated that all of the documents under review are Source Selection Sensitive, shall be disposed of properly and all inquiries regarding these proposal evaluations shall be made to Ms. Tisone or Ms. Woehrer.

LtCol Bauman asked for an explanation of the reason why only small businesses were able to compete for this LWARS procurement. Ms. Woehrer explained that this is a regulatory requirement based on the interest received from industry following a "sources sought" announcement released in FedBizOps. More than two small businesses with the applicable NAICS code were interested and deemed capable of performing the work. Therefore, in accordance with FAR Part 19, the determination was made by the PCO, in conjunction with the NAVAIR Small Business office, to set this procurement aside for competition among small businesses only. In addition, Ms. Woehrer noted that one offeror, Meggitt Armor Systems, was eliminated from the competition prior to the evaluations as they certified themselves to be a large business concern and, therefore, determined to be ineligible to compete in this small business set-aside. The determination to eliminate Meggitt Armor Systems from further consideration was documented in the Source Selection Authority (SSA) memorandum dated 22 March 2004.

Prior to commencing the Evaluation Team briefings, the SSEB briefly reviewed the overall evaluation results.

4. **Technical Evaluation:** LtCol MacCartney, the TET Chairperson, provided definitions for the qualitative technical ratings and proposal risk factors used by the TET to evaluate each offeror and advised that no numerical scoring was used in accordance with the requirements of the Source Selection Plan. He further explained that the members of the TET evaluated each proposal individually and then convened as a group to discuss their findings and assign an overall rating and risk factor for each offeror. The TET also identified the strengths, weaknesses and deficiencies for each proposal. LtCol MacCartney then briefed the SSEB on the individual and overall ratings and risk factors assigned by the TET for each offeror. A summary of the

TET's findings and supporting narrative for each offeror is set forth below in alphabetical order. Further detail related to the evaluation of each offeror is set forth in Enclosure (1).

| Offeror | Technical Rating | Proposal Risk |
|---|---|---|
| Armor Works | Outstanding | Low |
| Armour of America | Highly Satisfactory | Medium |
| Hardcore Composites | Satisfactory | Low |
| M-Cubed Technologies (RBBC) | Satisfactory | Medium |
| M-Cubed Technologies (RBSC) | Marginal | Medium |
| Meggitt Armor Systems* | | |
| Mide' Technology Corporation | Unsatisfactory | High |
| Neptune Precision Components | Satisfactory | Medium |
| Protective Materials Company | Satisfactory | Medium |
| Vertical Horizons One, Inc. | Satisfactory | High |

*LtCol MacCartney explained that Meggitt Armor Systems was determined to be a large business concern and was therefore deemed ineligible to participate in this small business set-aside competition.

**Armor Works:** Armor Works' technical proposal was rated **Outstanding** overall with a **Low** proposal risk. Armor Works proposed an aerial density reduction of 40%, which exceeds the 35% aerial density reduction requirement established in the RFP, with low risk. The technical team found Armor Works approach to be complete, thorough and well organized. In addition, the Technical team indicated that Armor Works' approach is sound, proven and meets or exceeds all requirements with minimal risk. Armor Works has few weaknesses and no deficiencies. Ms. Tisone asked if Armor Works' proposal addressed multi-hit capability. John Gallagher indicated that Armor Works explained how they will do it and addressed that issue as a requirement. A question was also raised regarding the type of maintenance required on the armor using a scanning device. John Gallagher indicated that an option for scanning was included in the proposal, but that no specific details were provided. One of the RFP requirements is that the LWARS is to be maintenance-free. Therefore, further clarification of this requirement is needed.

**Armour of America (AOA):** AOA's technical proposal was rated **Highly Satisfactory** overall with a **Medium** proposal risk. Armour of America proposed an aerial density reduction of 42%, which greatly exceeds the 35% aerial density reduction specified in the RFP. However, AOA had several weaknesses and deficiencies. Ms Tisone questioned why one of the evaluators assigned a rating of "highly satisfactory" versus an "outstanding" which was assigned by the other two evaluators in accordance with the evaluation guidelines established for this subfactor. LtCol MacCartney explained that he assigned a Highly Satisfactory rating because AOA calculated the aerial density reduction incorrectly. AOA did not satisfactorily meet the ballistic requirement and has high risk in this particular factor because they failed to justify or provide backup data to show how they will be able to meet this requirement. In addition, AOA did not identify what type of ammunition they were using to meet this ballistics requirement or where the testing was to take place. Therefore, further information is needed.

**Hardcore Composites:** Hardcore Composite's technical proposal was rated **Satisfactory** overall with a **Low** proposal risk. Hardcore Composites proposed an aerial density reduction of 35%, which is the minimum requirement specified in the RFP. Hardcore Composites had numerous weaknesses and several deficiencies including the failure to address the Fit and Technical Capabilities subfactors. It was unclear whether Hardcore Composites failed to include such information accidentally or if they are not actually able to meet the requirement. Further information is required.

**M-Cubed, Technologies (Reaction Bonded Boron Carbide – RBBC)**: M-Cubed's RBBC technical proposal was rated **Satisfactory** overall with a **Medium** proposal risk. M-Cubed proposed an aerial density reduction of 38%, which exceeds the 35% aerial density reduction specified in the RFP. M-Cubed's RBBC proposal had numerous weaknesses and several deficiencies. Their technical proposal also lacked a significant amount of information, which made it difficult to determine if the Fleet will receive a useful addition to their weapon system or a LWARS that has an increased maintenance burden. The TET noted that M-Cubed's subcontractor, Simula, Inc., would be doing what appears to be a majority of the work for this effort. Mr. Condurso, Counsel, questioned the amount or percentage of work that Simula, Inc. will perform since the small business must perform at least 51% of the work in a small business set-aside competition. Clarification on this issue is needed.

**M-Cubed, Technologies (Reaction Bonded Silicon Carbide – RBSC)**: M-Cubed's RBSC technical proposal was rated **Marginal** overall with a **Medium** proposal risk. M-Cubed's RBSC proposal included information that identified only a 33% weight reduction, which fails to meet the 35% aerial density reduction requirement specified in the RFP. Their technical proposal also lacked a significant amount of information, which made it difficult to determine if M-Cubed intended to propose a 33% weight reduction or if this is an error. The TET also noted that this lack of information made it difficult to determine if the Fleet will receive a useful addition to their weapon system or a LWARS that has an increased maintenance burden. The TET noted that M-Cubed's subcontractor, Simula, Inc., would be doing what appears to be a majority of the work for this effort. Mr. Condurso, Counsel, questioned the amount or percentage of work that Simula, Inc. will perform since the small business must perform at least 51% of the work in a small business set-aside competition. Clarification on these issues is needed.

**Mide' Technology Corporation**: Mide's technical proposal was rated **Unsatisfactory** overall with a **High** proposal risk. Mide's proposed an aerial density reduction of 19%, which fails to meet the 35% aerial density reduction requirement specified in the RFP. As such, the SSEB determined that the results of Mide's technical evaluation need not be presented.

**Neptune Precision Components:** Neptune's technical proposal was rated **Satisfactory** overall with a **Medium** proposal risk. Neptune proposed a range of percentages for the various pieces of armor with the greatest of these resulting in a 43% aerial density reduction. However, the TET noted that Neptune's calculation of the overall weight reduction depends upon the final design chosen by Neptune, as their proposal appeared to include four (4) different types of thickness. More information is needed to identify which of the four (4) designs Neptune will use to meet the Government's requirement. Neptune had numerous weaknesses and several deficiencies based on a lack of information. Neptune's proposal did not address the Technical

Capability subfactor in the areas of their manufacturing processes, identify their suppliers or sub-contractors for the LWARS production phase, or address whether they can meet the schedule specified in the RFP. In addition, more information is needed to determine if Neptune's proposed LWARS will meet the multi-hit capability requirements. Clarification on these issues is needed.

**Protective Materials Company:** Protective Material's technical proposal was rated **Satisfactory** overall with a **Medium** proposal risk. Protective Materials proposed an aerial density reduction of 35%, which meets the minimum requirement specified in the RFP. However, they stated that their LWARS will have a range of aerial densities, both above and below the minimum and it is unclear whether they will be able to meet the 35% requirement. In addition, Protective Materials failed to adequately address the majority of the other subfactors. Further information is required.

**Vertical Horizons One (VHO), Inc.:** Vertical Horizon's technical proposal was rated **Satisfactory** overall with a **High** proposal risk. Vertical Horizons proposed an aerial density reduction of 46%, which is exceeds the 35% aerial density reduction requirement specified in the RFP. However, they failed to provide any information to substantiate their proposed weight reduction. In addition, VHO failed to adequately address the majority of the other subfactors. Further information is required.

5. **Past Performance Evaluation**: Following the TET brief, Ms. Butler explained the process and the performance risk ratings used by the PPET to assess Past Performance Risk. She then presented the PPET evaluation results to the SSEB. A summary of the PPET findings and supporting narrative for each offeror is set forth below in alphabetical order. Further detail related to the evaluation for each offeror is set forth in Enclosure (2).

| Offeror | Past Performance Risk |
|---|---|
| ArmorWorks | Low |
| Armour of America | Low |
| Hardcore Composites | Low |
| M-Cubed Technologies | Low |
| Meggitt Armor Systems* | |
| Mide' Technology Corporation | Low |
| Neptune Precision Components | Low |
| Protective Materials Company | Very Low |
| Vertical Horizons One, Inc. | Unknown |

*As previously stated by the TET Chairperson, Meggitt Armor Systems was deemed ineligible based on their status as a large business.

**Armor Works**: Armor Works was assigned a **Low** Past Performance risk rating. Armor Works provided five (5) references. All were considered to be relevant and similar in scope, magnitude and complexity to LWARS. However, points of contact for only two (2) of the five could be reached for comment. No major problems were reported, and only minor delivery problems due to the availability of material were reported with one of the references. The PPET

found that there was no Past Performance Information Retrieval System (PPIRS) information available for Armor Works.

**Armour of America:** Armour of America was assigned a **Low** Past Performance risk rating. Armour of America provided two (2) references. All were considered to be relevant and similar in scope, magnitude and complexity to LWARS. However, points of contact for only one (1) of the two could be reached for comment. That reference stated that Armour of America delivered quality products within cost, on time, and with no major problems. There was no PPIRS information available for this offeror.

**Hardcore Composites:** Hardcore Composites was assigned a **Low** Past Performance risk rating. Hardcore Composites provided three (3) references. All were considered relevant in magnitude and complexity to LWARS, but not in scope. No major technical problems were reported. Quality issues were reported, one is still under investigation and the others were resolved quickly. Minor delivery problems were reported, but were resolved quickly and measures were put into place to prevent future occurrences. There was no PPIRS information available for this offeror. V-2 Composites and Plainsman Armor were identified as subcontractors. No references were provided for either company. Also, no PPIRS or other information was available for either company; therefore the risk rating for both companies is Unknown.

**M-Cubed Technologies:** M-Cubed Technologies provided identical Past Performance information for both their RBBC and RBSC proposals; therefore, the information provided was evaluated only once by the PET. M-Cubed Technologies was assigned a **Low** Past Performance risk rating. M-Cubed provided five (5) references; however, only four (4) were considered to be relevant and similar in scope, magnitude and complexity to LWARS and points of contact for only three (3) of the five could be reached for comment. Each of the three references stated that M-Cubed delivered quality products within cost, on time, and with no major problems. No PPIRS information was available for M-Cubed. In addition, it was reported that Simula, Inc., their proposed subcontractor, also delivered quality products within cost, on time, and with no major problems.

**Mide' Technology Corporation:** Mide' was assigned a **Low** Past Performance risk rating. Mide' provided five (5) references which were considered to be similar in complexity, but not scope or magnitude to LWARS. However, points of contact for only three (3) of the five could be reached for comment. For three (3) of the references, Mide' was a subcontractor and for the fourth reference, Mide' was a prime contractor. The four references stated that Mide' delivered quality products within cost, on time, and with no major problems. Minor delivery problems were reported, but problems were quickly corrected and measures were put into place to prevent future occurrences. There was PPIRS information for one contract with Mide' which showed schedule slips, however, corrective action was taken to maintain the delivery schedule.

**Neptune Precision Composites:** Neptune was assigned a **Low** Past Performance risk rating. Neptune provided five (5) references; however only two (2) of the five could be reached for comment. These two (2) references were considered to be relevant and similar in scope and complexity to LWARS. They reported that Neptune delivered quality products within cost, on time, and with no major problems. No PPIRS information was available for Neptune.

**Protective Materials Company:** Protective Materials Company was assigned a **Very Low** Past Performance risk rating. Protective Materials Company provided thirteen references. As specified in Section L of the RFP, only five (5) references were evaluated and all were considered to be relevant and similar in scope, magnitude and complexity to LWARS. The five (5) references stated that Protective Materials Company delivered quality products within cost, on time, and with no major problems.

**Vertical Horizons One, Inc.:** Vertical Horizons was assigned an **Unknown** Past Performance risk rating. According to the PPET, this rating was given because Vertical Horizons failed to provide the data the contract data, points of contact, relevance, past performance or demonstrated systemic improvement information specified in Section L of the solicitation. In addition, PPIRS did not contain any records under the name of Vertical Horizons One, Inc or under their cage code.

6. **Price Evaluation**: At the conclusion of the PPET brief, Ms. Matheny explained the process for evaluating the price proposals. Each Offeror's proposed Section B prices were reviewed to ensure mathematical accuracy, that all Certifications and Representations (Certs and Reps) were completed and complied with the terms and conditions of the solicitation. As specified in Section M of the RFP, price adjustments were made, when deemed appropriate, based upon input from the TET to reflect any additional costs associated with GFE/GFI required which was above that already identified in the RFP. A summary of the proposed and evaluated prices for each offeror is set forth below in alphabetical order. A written summary follows. Further detail related to the price evaluation for each offeror is set forth in Enclosure (3).

| Offeror | Evaluated Price For Qty of 147 | Proposed Price For Qty of 147 |
|---|---|---|
| Armor Works | $6,523,381 | $6,514,777 |
| Armour of America | $5,733,236 | * |
| Hardcore Composites | $4,852,665 | * |
| M-Cubed Technologies (RBBC) | $4,873,707 | $4,862,052 |
| M-Cubed Technologies (RBSC) | $4,223,103 | $4,211,527 |
| Meggitt Armor Systems** | | |
| Mide' Technology Corporation | $9,893,100 | $9,893,113 |
| Neptune Precision Components | $4,364,409 | * |
| Protective Materials Company | $9,223,214 | * |
| Vertical Horizons One, Inc. | $21,296,693 | * |

*PET could not determine the total Proposed Price with a reasonable degree of certainty.

** Meggitt Armor Systems was deemed ineligible to participate because it was not a small business concern .

**Armor Works:** Armor Works has acknowledged all amendments and completed all Section K- Certifications and Representations with one noted exception. Armor Works stated that they have participated in a previous contract action subject to Equal Employment Opportunity compliance; however, they have not filed all required reports. The PET noted

various Section B calculation errors in Armor Works' proposed price and that that additional GFE/GFI would be needed in the amount of $8,604. However, they determined that overall the evaluated price is consistent and appears reasonable for the proposed technical approach.

**Armour of America (AOA) :** AOA has acknowledged all amendments and completed all Section K- Certifications and Representations but noted that AOA stated, "due to the lower price for the quantities greater than 147, savings per shipset are better with more quantity". In addition, it was noted that AOA has certified that it is a Veteran-Owned Small Business Concern. The PET was unable to determine AOA's total proposed price (with reasonable certainty) due to errors and omissions in their proposal. Therefore, clarification is necessary. In addition, the PET determined that the proposed price was understated by $12,426 due to the need for additional GFE/GFI. However, based upon the information available, the evaluated price is consistent and appears reasonable for the proposed technical approach.

**Hardcore Composites:** Hardcore Composites has acknowledged all amendments and completed all Section K- Certifications and Representations with one exception noted. Hardcore Composites stated that they have participated in a previous contract action subject to Equal Employment Opportunity compliance; however, they have not filed all required reports. The PET was unable to determine Hardcore Composites' total proposed price with reasonable certainty due to errors and omissions. Therefore, clarification is necessary. However, based upon the information available, it appears that the evaluated price is consistent and reasonable for the proposed technical approach and no additional GFE/GFI is required.

**M-Cubed Technologies (RBBC):** M-Cubed Technologies has acknowledged all amendments and completed all Section K- Certifications and Representations with two noted exceptions; limited data rights are asserted for three (3) particular CDRLs and that Transportation of Supplies by Sea is anticipated. The PET found that Section B to be complete, there are no material imbalances and the mathematical calculations are correct. Minor mathematical differences as a result of rounding were noted. The approximate $12K difference between the M-Cubed proposed price and the Government evaluated price is the result of 80 hours being used by M-Cubed to calculate the total amount for CLIN 0009, Field Support Services, rather than 160 hours as specified in Section M. M-Cubed did not identify the rationale for the use of 80 hours vice 160; therefore clarification is needed. However, the PET determined that the evaluated price is consistent and appears reasonable for the proposed technical approach.

**M-Cubed Technologies (RBSC):** M-Cubed Technologies has acknowledged all amendments and completed all Section K- Certifications and Representations with two noted exceptions; limited data rights are asserted for three (3) particular CDRLs and that Transportation of Supplies by Sea is anticipated. The PET found that Section B to be complete, there are no material imbalances and the mathematical calculations are correct. Minor mathematical differences as a result of rounding were noted. The approximate $12K difference between the M-Cubed proposed price and the Government evaluated price is the result of 80 hours being used by M-Cubed to calculate the total amount for CLIN 0009, Field Support Services, rather than 160 hours as specified in Section M. M-Cubed did not identify the rationale for the use of 80 hours vice 160; therefore clarification is needed. However, the PET determined that the evaluated price is consistent and appears reasonable for the proposed technical approach.

**Mide' Technology Corporation:** Mide' has acknowledged all amendments and completed all Section K- Certifications and Representations with two exceptions noted. Mide' noted that they have not participated in contracts or subcontracts subject to EEO compliance, and that they do not have Affirmative Action Compliances established and have not been involved with previous contracts subject to Affirmative Action. No additional GFE/GFI is required. The PET noted that Section B contained minor errors, however, there are no material imbalances and the mathematical calculations are correct. Mide' listed a unit price for CLIN 0004, Travel, that did not equal the total price listed; however, they listed the correct total Not-To-Exceed amount. Per Section B of the RFP, the contractor shall insert a NTE dollar amount of $50,000 for travel CLINs, 0004 and 0010. The PET used the total NTE of $50,000 for the evaluation. Mide' did not list the quantity or the hourly rate for CLIN 0009, Field Support Services; only included the total price. Per Section M, for all CLINs, other than 0005 and 0006, the maximum quantities shall be used for evaluation. The PET divided the total price by 160 hours, the maximum quantity of hours per Section M instructions, to calculate the hourly rate. The PET also noted that Mide's evaluated price is 51.66% higher than the highest reasonably priced offer and appears high for their proposed technical approach.

**Neptune Precision Composites:** Neptune has acknowledged all amendments and completed all Section K- Certifications and Representations with two exceptions noted. Neptune stated that they are "Not Applicable" to the Affirmative Action Compliance and that their facility does not meet the reporting thresholds of toxic chemicals or within the SIC and NAICS sectors listed. Ms. Matheny stated that the PET could not determine Neptune's total proposed price due to several proposal inconsistencies. Neptune entered unit prices for the main CLINs 0005, 0006, 0007 and 0008 that seemed to have no relation to the amounts listed for the SubCLINs under those CLINs. The PET was unable to determine what these amounts represented; therefore, the PET used only the prices listed for the SubCLINs for the evaluation. Neptune included a price for CLIN 0003, data for CLINs 0001 and 0002. Section B instructions stated Data CLIN 0003 is NSP. For the evaluation, the PET included this amount in the total evaluated price. Neptune used a quantity of 78 to calculate the total amount for CLINs 0005AB and 0006AB. The PET used a quantity of 79 times the unit price in order to arrive at a total for 226 kits for the evaluation. However, the PET determined that the evaluated price is consistent and appears reasonable for the proposed technical approach.

**Protective Materials Company:** Protective Materials has acknowledged all amendments and completed all Section K- Certifications and Representations. However, the PET did note there was technical information in the General Section of the proposal. Ms. Matheny stated that the PET could not determine Protective Materials' total proposed price with reasonable certainty due to several proposal inconsistencies. Protective Materials Company used incorrect quantities when calculating the total amounts for CLINs 0005AB, 0006AA and 0006AB. For the evaluation, the PET used the correct quantities, as detailed in Section M of the RFP, times the unit prices in the proposal to calculate the total proposed price per CLIN. Protective Materials included a price for CLIN 0003, data for CLINs 0001 and 0002. Section B instructions stated Data CLIN 0003 is Not Separately Priced (NSP). For the evaluation, the PET included this amount in the total evaluated price. In addition, Protective Materials used incorrect amounts for travel CLINs 0004 and 0010. Per Section B instructions, these CLINs were to be listed as a NTE amount of $50,000 each. For the evaluation, the PET replaced the values listed under CLINs 0004 and 0010 with the NTE amount of $50,000, in order to calculate the total evaluated price.

Furthermore, Protective Materials used a quantity of 640 hours times the hourly rate to calculate the total proposed amount for CLIN 0009, Field Support Services. Per Section M instructions, the quantity for CLIN 0009 should be 160 hours, the maximum quantity. For the evaluation, the PET used Protective Materials' total proposed amount based on 640 hours times the hourly rate. The PET noted that Protective Materials price is 41.38% higher than the highest reasonably priced offer and the evaluated price appears high for the proposed technical approach.

**Vertical Horizons One (VHO), Inc.:** VHO has acknowledged all amendments and completed all Section K- Certifications and Representations with three (3) exceptions noted. VHO stated that "Items are of economical advantage to the Government", that they are a small Service-Disabled Veteran-Owned Business, and that their facility does not have 10 or more full-time employees. Ms. Matheny also noted that VHO elected not to submit revised prices under Amendment 0004 to the RFP. They stated they had already taken the changes reflected in Amendment 0004 into account on their original proposal. Ms. Matheny further noted that the PET was unable to accurately determine VHO's total proposed price due to numerous proposal errors and inconsistencies. VHO listed the total proposed amount under CLIN 0001, NRE, as verified by VHO in an email. VHO did not list a separate price for CLIN 0001. For the evaluation, the PET used $0 as the price for CLIN 0001. In addition, the total proposed amounts for each CLIN did not equal the total amount of $21,517,662 listed under CLIN 0001. VHO listed amounts for the main CLINs 0005, 0006, 0007 and 0008 that did not equal the total of the two SubCLINs under each CLIN. The PET was unable to determine what these amounts represented. The PET entered the correct Kit names. VHO also included a price for CLIN 0003, data for CLINs 0001 and 0002. Section B instructions stated Data CLIN 0003 is NSP. For the evaluation, the PET included this amount in the total evaluated price. VHO did not list a unit price for CLINs 0002, 0007AA, 0007AB, 0008AA or 0008AB as specified in Section B. For the evaluation, the PET divided the total amount by the quantity to calculate the unit price for each CLIN. In addition, VHO did not include a quantity or unit price for CLINs 0005AA, 0005AB, 0006AA or 0006AB. For the evaluation, the PET divided the total amount by the quantities specified in Section M of the RFP to calculate the unit price for each CLIN. The PET noted that VHO's evaluated price is 226.47% higher than the highest reasonably priced offer and appears to be very high for the proposed technical approach.

7. **SSEB Deliberations:** The SSEB reviewed and discussed all of the evaluation information provided by the TET, PPET and PET chairpersons. In addition, the SSEB further considered whether award could be made on initial offers as permitted by Section M of the solicitation or whether a competitive range should be established for the purposes of discussions and request for final revised proposals. The results of these deliberations and the SSEB's subsequent recommendation relative to each offeror's proposal are set forth below in alphabetical order. For the purposes of this source selection, proposals were not ranked.

| | Tech Rating | Proposal Risk | Past Performance Risk | Total Evaluated Price |
|---|---|---|---|---|
| Armor Works | O | L | L | $ 6,523,381 |
| Armour of America | HS | M | L | $ 5,733,236 |
| Hardcore Composites | S | L | L | $ 4,852,665 |
| M-Cubed (RBBC) | S | M | L | $ 4,873,707 |
| M-Cubed (RBSC) | M | M | L | $ 4,223,103 |
| Mide' Technology | U | H | L | $ 9,893,100 |
| Neptune Precision | S | M | L | $ 4,364,409 |
| Protective Materials | S | M | VL | $ 9,223,214 |
| Vertical Horizons | S | H | U | $ 21,296,693 |

**Armor Works:** The SSEB determined that award could not be made to ArmorWorks without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. With proper consideration given to the TET, PPET and PET findings, Armor Works' proposal will be included in the competitive range.

**Armour of America:** The SSEB determined that award could not be made to Armour of America without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. With proper consideration given to the TET, PPET and PET findings, Armour of America's proposal will be included in the competitive range.

**Hardcore Composites:** The SSEB determined that award could not be made to Hardcore Composites without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. With proper consideration given to the TET, PPET and PET findings, Hardcore Composites will be included in the competitive range.

**M-Cubed Technologies (RBBC):** The SSEB determined that award could not be made to M-Cubed Technologies (RBBC) without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. With proper consideration given to the TET, PPET and PET findings, M-Cubed Technologies' RBBC proposal will be included in the competitive range.

**M-Cubed Technologies (RBSC):** M-Cubed's RBSC proposal contained the lowest proposed price. However, the SSEB determined that award could not be made to M-Cubed Technologies (RBSC) without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. Although M-Cubed was assigned a technical rating of Marginal with Medium risk, the SSEB believes that this rating and risk could easily be improved following discussions. With proper consideration given to the TET, PPET and PET findings, M-Cubed Technologies' RBSC proposal will be included in the competitive range.

**Mide' Technology Corporation:** Mide's technical proposal was rated Unsatisfactory with High risk and their price proposal was considered to be high for their proposed approach. The SSEB determined that significant revisions would have to be made in order to improve Mide's technical proposal and it is unlikely that Mide' will lower their price sufficiently to be considered for award. Therefore, with proper consideration given to the TET, PPET and PET findings, Mide's proposal will not be included in the competitive range.

**Neptune Precision Components:** The SSEB determined that award could not be made to Neptune without discussions. More information is needed by the TET and PET to clarify inconsistencies and questions generated from the SSEB and in the proposal. With proper consideration given to the TET, PPET and PET findings, Neptune's proposal will be included in the competitive range.

**Protective Materials Company (PMC):** Although PMC was assigned a technical rating of Satisfactory with Medium risk, the SSEB believes it is unlikely that PMC will lower their price sufficiently to be considered for award. Therefore, with proper consideration given to the TET, PPET and PET findings, PMC's proposal will not be included in the competitive range.

**Vertical Horizons One (VHO), Inc:** VHO was assigned a technical rating of Satisfactory with High risk, however, the SSEB believes it is unlikely that VHO will lower their price sufficiently to be considered for award. Therefore, with proper consideration given to the TET, PPET and PET findings, VHO's proposal will not be included in the competitive range.

8. **Summary**: In summary, the SSEB determined that award could not be made to any of the offerors based upon their initial proposals because there are numerous unanswered technical and/or price questions. The prices and/or technical approaches proposed by Mide' Technology Corporation, Protective Materials Company and Vertical Horizons One, Incorporated, were so high and/or technically rated in such a way that the SSEB does not believe that any amount of discussions will place them within the competitive range for award. Therefore, for efficiency reasons and to avoid further investment by the offerors, the proposals submitted by these three offerors will no longer be considered and as such they will be notified immediately. The SSEB determined that the remaining offerors: Armor Works, Armour of America, Hardcore Composites, M-Cubed Technologies (for both their RBBC and RBSC proposals) and Neptune Precision Components, all have a reasonable chance to receive the award following the receipt of additional information and details related to their proposals. These offerors should be included in the competitive range. Discussion letters and final revised proposals will be requested from each company. Upon receipt of revised proposals, the respective evaluation teams will evaluate the revised proposals and submit their final results to the SSEB for final consideration and recommendation for award.

Date: 3-26-04

JANICE E. WOEHRER
SSEB Chairperson